**GENERAL SERVICE EMPLOYEES UNION LOCAL NO. 73, affiliated with Service Employees International Union, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 76–1708.

United States Court of Appeals, District of Columbia Circuit.

Argued June 10, 1977.

Decided Feb. 22, 1978.

Rehearing Denied May 4, 1978.

Stephen B. Rubin, with whom Gerald Sommer, Washington, D. C., was on the brief, for petitioner.

Allison W. Brown, Jr., Deputy Asst. Gen. Counsel, Washington, D. C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Bert Bisgyer, Atty., National Labor Relations Board, Washington, D. C., were on the brief, for respondent.

Before WRIGHT and MacKINNON, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the court filed by MacKINNON, Circuit Judge.

Dissenting opinion filed by WRIGHT, Circuit Judge.

MacKINNON, Circuit Judge:

General Service Employees Union, Local 73 ("the Union") petitions to review and set aside an order of the National Labor Relations Board ("NLRB" or "the Board"). The order was issued on June 8, 1976, pursuant to section 10(c) of the National Labor Relations Act, as amended ("the Act")[1] and required the Union to cease and desist from threatening to picket the A–1 Security Service Company ("the Company") for recognition at a time when it was disqualified from filing a valid petition to be certified under section 9 of the Act as the bargaining representative of the Company's employees. The Board has cross-applied for enforcement of its order, and jurisdiction is conferred on this court by section 10(e) and 10(f) of the Act.[2]

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. 29 U.S.C. § 151 *et seq.* (1970).

2. The following sections of the National Labor Relations Act are pertinent to this decision. Section 8(b) of the Act provides:

It shall be an unfair labor practice for a labor organization or its agents—

The factual setting of this case is not complex. The Company is in the business of providing guard services and had signed a collective bargaining agreement with the Independent Guards and Watchmen of America, a rival union to petitioner. Sever-

\*     \*     \*     \*     \*     \*

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

(A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,

(B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or

(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection.

29 U.S.C. § 158(b) (1970).

Section 8(c) provides:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c) (1970).

Section 9(b) provides:

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not

\*     \*     \*     \*     \*     \*

(3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

29 U.S.C. § 159(b) (1970).

Section 9(c)(1) provides:

Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a) of this section, or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a) of this section; or

(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a) of this section;

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

29 U.S.C. § 159(c)(1) (1970).

al months after the signing of this collective bargaining agreement, the attorney for the petitioner contacted the Company to complain both of contracts the latter had signed with allegedly nonunion contractors and also of the possibility that it was paying substandard wages and benefits. A conference was arranged between the Union's attorney and the President of the Company, at which the lawyer for the Union made clear to the Company's President the benefits his business would receive from joining the Union, and the retaliation it could expect if it did not do so.[3] Shortly thereafter, the Union's lawyer contacted Illinois Bell, a major source of business for the Company, requested information concerning which Bell sites employed guards from the Company, and stated that the conditions of employment of the A–1 Security Service Company were "substandard." At the same time, the Union sent a letter to the Company threatening it with what was referred to as "area standards" picketing, i. e., picketing to protest substandard working conditions,[4] and requested certain information about the exact nature of those conditions. The letter disavowed any desire to encourage the Company to recognize the Union or to sign a collective bargaining contract with it. The Company did not respond, and no picketing ensued.

Upon the Company's complaint, the NLRB, in a 3–2 decision,[5] held that the letter threatening "area standards" picketing constituted an unfair labor practice under subparagraph 8(b)(7)(C)[6] of the Act because this threat was in fact—despite the terminology and disavowals of the Union—a threat to engage in recognitional picketing at a time when the Union was disqualified by law from filing a valid election petition and from being certified as the recognized collective bargaining agent. It is conceded that actual "area standards" picketing, or a threat to engage in such picketing, would not have constituted an unfair labor practice under 8(b)(7)(C).[7] The NLRB had occasion, however, in 1975 to "pierce" the veil of "area standards" picketing and find a recognitional motive in a decision holding that the same Union and the same lawyer that acted for the Union here had engaged in an unfair labor practice,[8] and it does so once again in this case.

Three issues are presented in the instant case. Two are purely legal and one is premised on a factual determination by the NLRB. First, should the Landrum-Griffin Act[9] be construed to proscribe, in certain circumstances, mere threats to picket as well as actual picketing. Second, does the Act allow the "reasonable period not to exceed thirty days" provided for recognitional picketing under subparagraph 8(b)(7)(C) even though the Union involved is disqualified from certification as a recognized collective bargaining agent under the terms of section 9(b)(3) of the Act.[10] Third, is the determination by the NLRB that the

3. The Union's lawyer emphasized that unless the Company agreed to become associated with it, the Union would restrict the Company's business opportunities as it had allegedly done with other guard companies who had signed agreements with the Independent Guards and Watchmen of America. J.A. 6.

4. The gauge of standard wage and benefit levels used by the Union was the "Blue Book," which was simply the collective bargaining agreement between the Union and the Associated Guard and Patrol Agencies. This agreement covered approximately 90% of the guards in the Chicago metropolitan area. Petitioner's Brief at 12; J.A. 15 n.18.

5. Members Jenkins, Penello and Walther formed the majority; Chairman Murphy concurred in part and dissented in part; Member Fanning dissented.

6. *See* note 2 *supra.*

7. *See* Respondent's Brief at 32; *Houston Building & Construction Trades Council (Claude Everett Construction Co.),* 136 NLRB 321, 323 (1962).

8. *General Service Employees Union, Local No. 73, Affiliated With Service Employees International Union, AFL–CIO (R.R.S. Inc. Security and Investigation Service Division),* Board Case Nos. 13–CC–836, 13–CP–277 (January 22, 1975, unpublished).

9. Act of Sept. 14, 1959, Pub.Law 86–257, 73 Stat. 519.

10. *See* nn. 1–2 *supra.*

threats made by the Union were threats of recognitional, not "area standards" picketing supported by substantial evidence.[11] We find that the Board's interpretation of the Landrum-Griffin Act is both more reasonable and more consonant with the legislative intent than the Petitioner's, and its characterization of the Union's threat as one involving recognitional picketing is supported by substantial evidence. Accordingly, we grant enforcement of the Board's order and deny the Union's petition.

## I

■ Petitioner contends that subparagraph (C) of paragraph 8(b)(7) of the Act regulates only actual picketing, not mere threats to picket. However, the Union concedes that the introductory language of 8(b)(7) and subparagraphs (A) and (B) of that paragraph[12] encompass threats to picket as well as picketing itself. Any party attempting to demonstrate that the introductory wording of a section in a statute should be deemed inapplicable to one of its subsections, despite this wording's conceded applicability to the entire rest of the section clearly must carry a heavy burden of persuasion, and we conclude that Petitioner has not successfully discharged that burden in this case.

The basis for the Union's argument is that Congress, in prefacing subparagraph (C) with the phrase—not found in either subparagraph (A) or (B)—"Where such picketing has been conducted," meant to exclude mere threats from the purview of that subparagraph.[13] The Union maintains that there is an "irreconcilible" conflict be-

tween the introductory language of 8(b)(7) as a whole, which explicitly encompasses "threats to picket," and the opening phrase of subparagraph (C). Given such a conflict, Petitioner insists that one must examine the legislative intent in order properly to interpret the statute. Characterizing the Landrum-Griffin Act as the result of "legislative compromise reached as a result of intense conflict between competing interests,"[14] the Union asserts—without adducing significantly more evidence from the legislative history than the general "compromise" nature of the Landrum-Griffin Act[15]—that the final version of subparagraph 8(b)(7)(C) restricted the scope of that provision to regulating actual instances of picketing.

Assuming arguendo that there is an apparent inconsistency between the broad language introducing 8(b)(7) and the opening phrase of 8(b)(7)(C)[16] which necessitates an examination of the legislative history in order to illuminate the meaning of the statute (this history would, of course, be relevant even were there no such apparent conflict), we feel that Petitioner has misconstrued the intent of Congress. Certainly the fact that 8(b)(7)(C) begins with a reference to "such picketing" rather than "such picketing or threats to picket" is not persuasive indication of a legislative purpose not to regulate such threats. A statute is not to be read overliterally.[17] It has long been settled that acts of Congress must be interpreted in light of the spirit in which they were written and the reasons for their enactment.[18] Grammatically, as

11. J.A. 7–9.

12. See note 2 supra.

13. Petitioner's Brief at 21–32.

14. Id. at 22.

15. Id. at 28–32.

16. But see text at note 28.

17. Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); Clark v. Uebersee Finanz-Korporation, A.G., 332 U.S. 480, 488–89, 68 S.Ct. 174, 92 L.Ed. 88 (1947); Mon-

arch Life Ins. Co. v. Loyal Protective Life Ins. Co., 326 F.2d 841, 845 (2d Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964) ("With his [Judge Learned Hand] customary eloquence he stated that 'the duty of ascertaining [the] meaning [of a statute] is difficult at best, and one certain way of missing it is by reading it literally . . . .' ").

18. National Woodwork Mfrs. Ass'n v. United States, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Jacobson v. Massachusetts, 197 U.S. 11, 39, 25 S.Ct. 358, 49 L.Ed. 643 (1905); Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); United

one does not usually speak of a threat "being conducted," the introductory phrase of 8(b)(7)(C) is not easily amenable to an interpretation which includes threats to picket within the subparagraph's expressed purview. However, since we find that the manifest intent of Congress was to treat (1) picketing, (2) causing to be picketed, (3) threats to picket, and (4) causing (threats) to picket as being interchangeable, we restrict threats to picket to the same extent as actual picketing and also, of course, as causing to be picketed and causing threats to picket. We attribute 8(b)(7)(C)'s arguable grammatical anomaly to the grammatical difficulty of literally including the other three objectives of subsection (7) and possibly to less than skillful draftsmanship,[19] not to any legislative purpose to exclude the three other objects of subsection (7), and accordingly place little weight on it.

Were the legislative history silent or neutral on the question of whether the Landrum-Griffin Act meant to regulate threats to picket under subparagraph 8(b)(7)(C), the phraseology chosen to introduce that subsection might give us pause. In fact, however, the proposal that eventually matured into the current subparagraph 8(b)(7)(C) was referred to throughout the legislative process as applying to both threats to picket and picketing itself[20]—as, indeed, did other amendments to the Taft Hartley Act suggested in the Eighty-Sixth Congress.[21] Senator (later President) Kennedy, the Chairman of the Conference Committee on the Landrum-Griffin Act, in a resolution of instruction explained the effect of 8(b)(7)(C) in terms alluding to situations of threats to picket:

> Under our substitute, if the result of picketing is to deny the entry of goods—

in other words, if the Teamsters say *"sign up or you will not get any goods,"* an early election may be obtained. (Emphasis added.)[22]

Senator Kennedy's remark may be dismissed as no more than merely suggestive of the extent to which it was assumed that instances of threats as well as actual picketing would be comprehended within the rules of the Landrum-Griffin Act, but other legislative statements on the Act are explicit in stating that subparagraph 8(b)(7)(C) was meant to cover both circumstances. The Senate Committee on Labor and Public Welfare in its "Section-by-Section Analysis" of the Landrum-Griffin Act—issued after the measure had passed both Houses—states straightforwardly:

> This section [8(b)(7)] makes it an unfair labor practice for a union to picket or threaten to picket where an object is to gain recognition or promote organization of employees *under three circumstances . . . .* (Emphasis added.)[23]

The "three circumstances" alluded to can only defer to the three subparagraphs of 8(b)(7). There is no hint that subparagraph (C) was meant to be in any way more restricted in its scope than subparagraphs (A) and (B), and there is no question but that (A) and (B) both encompass threats to picket as well as picketing itself.

To the same effect, Senator Goldwater, the ranking minority member of the Senate and Conference Committee, analyzing the Landrum-Griffin Act in an Extension of Remarks in the Senate on the day the President signed the bill, stated:

> Under this provision [8(b)(7)], it is an unfair labor practice for a union, *in three*

---

*States v. Kirby*, 74 U.S. (7 Wall.) 482, 19 L.Ed. 278 (1868).

**19.** Petitioner refers to the somewhat careless draftsmanship of the Landrum-Griffin Act, Petitioner's Brief at 22; *see also* Morris, ed., The Developing Labor Law 560 (1971).

**20.** *E. g.,* 1 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (herein, "Legis. Hist.") 684–85 (G.P.O. 1959).

**21.** 105 Cong.Rec.S. 1387 (1959) (McClellan bill); 105 Cong.Rec.H.R. 8400 (1959) (The Landrum-Griffin bill).

**22.** 2 Legis.Hist. 1373, 1377.

**23.** 1 Legis.Hist. 966, quoted in *Dayton Typographical Union No. 57 v. NLRB*, 117 U.S.App. D.C. 91, 96–97, 326 F.2d 634, 639–40 (1963).

*specific* situations, to picket or cause to be picketed, or threaten to picket or cause to be picketed an employer. (Emphasis added.)[24]

This particular remark conformed to the explanatory comment of the Senate Committee on Labor and Public Welfare and is important not only because it explicitly states that 8(b)(7)(C) covers threats to picket, but also because it demonstrates that the phrase "such picketing" in 8(b)(7)(C) on which Petitioner places so much emphasis is indeed only a shorthand for the longer phrase used in the introduction "picket or cause to be picketed, or threaten to picket or cause to be picketed."[25] If Congress had not intended the terms "such picketing" to refer to the entire antecedent phrase in 8(b)(7)—the only possible antecedent to which the "such" might refer—but only to a part of it, it would normally have taken more care to enumerate exactly which parts of the antecedent language it intended to excise from the purview of subparagraph (C). The generality of the phrase "such picketing" indicates, as does Senator Goldwater's comment, that it was meant simply as an abbreviation for the cumbersome introductory phrase "picket, or cause to be picketed, threaten to picket or cause to be picketed."

Were it not for semantic difficulties with applying the verb form "has been conducted" to a threat to picket,[26] there would be little reason to suppose that "such picketing" did not refer to the entirety of the introductory phrase in 8(b)(7). This difficulty, however, is not of sufficient dimension to preclude our affirming the Board's interpretation by adopting what we take to be the most reasonable reading of the statute in light of both its syntactical structure and legislative history. Although the Union insists that the statutory language is utterly inconsistent with the position that threats to picket should be included in regulations established by subparagraph (C),[27] in fact, we find that this language in fact lends support to an interpretation of the Landrum-Griffin Act which treats picketing and threats to picket as on a par. Although the parties did not brief the issue, it is of significance that Congress in formulating the statute chose to repeat the phrase "or cause to be picketed" after both "to picket" and "to threaten to picket":

> It shall be an unfair labor practice for a labor organization or its agents . . . to picket or cause to be picketed, or threaten to picket or cause to be picketed.[28]

The parallelism of the phrases in which "to picket" and "threaten to picket" are used is an indication of the extent to which Congress considered picketing and threats to picket to present parallel problems. The syntax of the sentence supplies an affirmative statement—at least as persuasive as the grammatical anomaly of referring to threats "being conducted" is for the Union's position—that Congress desired to afford similar treatment to threats to picket and to actual picketing.

Although the specific question of whether a threat to picket is within the purview of 8(b)(7)(C) is one of first impression, the NLRB has consistently interpreted this introductory language as applying to all three of the subparagraphs of 8(b)(7), and we see no reason in either the legislative history or in the plain words of the statute, to dispute the Board's interpretation:

> At the risk of laboring the obvious, it is important to note that structurally as well as grammatically, the subparagraphs

---

**24.** 2 Legis.Hist. 1843, 1858. Senator Goldwater specifically enumerated the three circumstances involved and one of these was that set forth in 8(b)(7)(C). 105 Cong.Rec. A8509 (1959).

**25.** Senator Goldwater, the senior minority member of the Conference Committee, certainly used "such picketing" in this shorthand manner, e. g., 2 Legis.Hist. 1357, 1361 (printed remarks in the Senate).

**26.** To speak of a threat "being conducted" is not necessarily incorrect usage, although the choice of vocabulary is unusual.

**27.** Petitioner's Brief at 26.

**28.** *See* note 2 *supra*.

(a), (b), and (c) are subordinate to and controlled by the opening phrases of section 8(b)(7).

*Int'l Hod Carriers, Local 840 (Blinne Construction Co.),* 135 NLRB 1153, 1159 (1962).

Petitioner insists, supported by a dissenting member of the NLRB,[29] that the interpretation of the statute which we embrace above has led the NLRB to deal more harshly with threats to picket than with actual picketing (thereby raising some possible First Amendment problems) and also is at odds with the spirit of the Landrum-Griffin Act which elsewhere specifically protects speech and publicity.[30] This argument is premised on the concept that while actual picketing in order to continue for thirty days (and so exhaust the "grace period" provided for recognitional picketing under 8(b)(7)(C)) must be actually engaged in during 30 days, the NLRB deems that a threat is "being conducted" until it is withdrawn, without need of constant renewal.[31] It is, however, the nature of a threat to continue until it is retracted. If a man threatens an assault on a certain day, the effect of his statement can hardly be said to lapse by the next day. Furthermore, that the Act specifically protects speech in some instances is irrelevant to the question of whether or not it was intended to regulate threats to picket. To maintain otherwise would be no more convincing than to argue that as the Constitution protects some forms of speech, it must also protect threats and extortion. In fact, one of the primary concerns of the legislators who engineered the Landrum-Griffin Act—far from guaranteeing protection for all forms of speech—was providing for the control of extortionate behavior by the unions,[32] and such activity can take place through the medium of threats as easily as through actual picketing. It is also significant that section 8(c), which exempts discussion and argument from proscription as an unfair labor practice, does not protect expression that includes a "*threat* of reprisal or force . . . ." (Emphasis added.) Certainly the Constitution does not prohibit the regulation of such conduct.

Whereas speech is oftentimes protected more than conduct because, *inter alia*, it has less tangible results,[33] it is not the case that threats to picket usually tend to be less deleterious to the interests of an employer than actual picketing. Indeed, depending on how the threat is made known, it may have virtually the same effect as an actual picket line. To take an obvious example, if in a largely union town an important union announced in a local newspaper its threat to picket a certain employer, the results could be as devastating as those any actual picketing might produce; indeed, perhaps more so, as more persons might be reached by the advertisement than would actually have seen a picket line. There is, in fact, no rigid dichotomy possible between threatening to picket and picketing; threat is a significant aspect of picketing itself, and a threat to picket may accomplish the same coercive objective as actual picketing.

In sum, in light of the legislative history, the similarity in effect between threats to picket and actual picketing, and the wording of the Landrum-Griffin Act, it would have required a far more convincing demonstration of congressional intent to exclude threats to picket from the provisions of 8(b)(7)(C) than Petitioner has been able to supply for this Court to overturn the Board's decision. The Union has at most convinced us that the statute, like some others, is not a model of clarity,[34] but it has produced no persuasive arguments that

---

**29.** Chairman Murphy, J.A. 13 n.12.

**30.** 8(c), 8(b)(4) and 8(b)(7)(C) all refer either to speech or publicity.

**31.** J.A. 10 n.8.

**32.** *See* Meltzer, *Organizational Picketing and the NLRB: Five on a Seesaw,* 30 U.Chi.L.Rev. 78, 79–81 (1962).

**33.** *E. g., International Brotherhood of Teamsters, Local 695 v. Vogt, Inc.,* 354 U.S. 284, 289, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957).

**34.** Apparently these difficulties were recognized at the time, Petitioner's Brief at 22.

Congress did not mean in 8(b)(7)(C) to reach the same type of conduct as is specifically covered by the other subparagraphs of 8(b)(7).

## II

Under the terms of 8(b)(7)(C), picketing, or a threat to picket, constitutes an unfair labor practice unless a petition is filed with the NLRB within a reasonable period not to exceed thirty days requesting an expedited certified election to determine the proper collective bargaining representative. A union may continue its recognitional picketing during this "reasonable period." In the instant case, the NLRB felt, however, that the time limitation was more or less inoperative, and that it was not necessary to determine whether or not Petitioner's threat to picket had continued for a reasonable period not exceeding thirty days, because the Board determined that, as the Union in question had voluntarily admitted into its membership employees other than guards, it had—under a long line of NLRB precedent [35] and section 9(b)(3) of the Act [36] disqualified itself from being certified as the collective bargaining representative for guard employees. Because Petitioner could never be certified, the Board ruled that any petition for a certified election that it might file would be a nullity and that accordingly, "any recognitional picketing of A–1 Security that Respondent [here the Petitioner] might engage in *for whatever duration,* would be a violation of section [*sic*] 8(b)(7)(C)." [37] (Emphasis added.) Thus, the Union violated 8(b)(7)(C) the moment it threatened recognitional picketing, not a month later.

Petitioner on the other hand, argues that the wording of 8(b)(7)(C) expressly makes irrelevant, insofar as the status of petitions for certified elections under that subparagraph are concerned, considerations of whether or not the petitioner could ultimately be certified as a collective bargaining agent. 8(b)(7)(C) states that the NLRB shall consider petitions under that section "without regard to the provisions of section 9(c)(1) [38] or the absence of a showing of a substantial interest on the part of the labor organization."

The Union argues that the provision that the Board shall consider 8(b)(7)(C) petitions without regard to section 9(c)(1) mandates that issues of whether a valid question of representation has been raised are explicitly removed from the Board's consideration in acting upon such petitions. The proper course, in a situation where the petitioner cannot be certified is, Petitioner maintains, for the Board to hold an election and certify the arithmetical result, even though it cannot certify the Union as the bargaining representative. [39] Petitioner contends that the point of 8(b)(7)(C) was not to bar all recognitional picketing by uncertifiable groups, but only such picketing which continues for more than a reasonable time. Petitioner's Brief at 24. The short answer to this contention is that any amount of recognitional picketing by an unrecognizable group is unreasonable. Because the petition process is not a nullity under this interpretation of 8(b)(7)(C), the Union contends that it cannot be held—due to the up to thirty day "grace period"—in violation of the Act.

We are unconvinced by this somewhat imaginative interpretation that the Petitioner would have us give to the statute, nor will we accept the Union's invitation to regard section 9(b)(3) of the Act, prohibiting the certification of unions containing

---

35. *Drivers, Chauffeurs, Warehousemen & Helpers, Local Union No. 71, a/w I.B.T., et al. (Wells Fargo Armored Service Corp.),* 221 NLRB No. 240 (1975), 91 L.R.R.M. 1109, enforced, *Drivers, Chauffeurs, Warehousemen & Helpers, Local No. 71, a/w I.B.T. v. N.L.R.B.,* 180 U.S.App.D.C. 192, 553 F.2d 1368 (1977); *Drivers, Chauffeurs & Helpers, Local 639 (Dunbar Armored Express Co.),* 211 NLRB 687 (1974).

36. *See* note 2 *supra.*

37. J.A. 10, citing the cases cited in footnote 35 *supra.*

38. *See* note 2 *supra.*

39. Petitioner's Brief at 31–36.

both guards and non-guards as the collective bargaining agent for the guards, as totally unrelated to the status of petitions for certified elections under 8(b)(7)(C). The position the Board adopts on this point has recently been sustained by this court in *Drivers, Chauffeurs, Warehousemen and Helpers Local No. 71 v. NLRB (Wells Fargo Armored Service Corporation)*, 180 U.S. App.D.C. 192, 553 F.2d 1368 (1977), and we see no reason to suggest deviation from the rationale or result there put forward. In that opinion, we pointed out that 8(b)(7)(C) "appears to contemplate picketing by way of prelude to an election," [40] and drew the logical conclusion that where a party is disqualified from winning an election as certified bargaining representative, he cannot make use of the procedures that are intended to lead to that result.[41] Those cases in which the Board has allowed a non-certifiable union to participate in an election established not the *right* of such unions to participate, but rather only the discretion of the Board to allow them to do so, a discretion "within that area of expertise in which courts hesitate to interfere," 180 U.S.App.D.C. at 200, 553 F.2d at 1376, citing *Miami Newspaper Printing Pressmen's Union, Local 46 v. McCulloch*, 116 U.S.App.D.C. 243, 248 n.11, 322 F.2d 993, 998 n.11 (1963).

The present case is factually slightly different from *Wells Fargo* in that there the NLRB had actually dismissed petitioner's 8(b)(7)(C) request for an election, whereas here no such petition was filed; but the principle underlying *Wells Fargo* is on all fours with that we adopt in disposing of this appeal. When the characteristics of a union conclusively preclude it from becoming a certified representative, the Board in its discretion may consider an 8(b)(7)(C) petition by such a union a nullity on its face. That the Board has occasionally allowed a non-certifiable union to participate in a certified election and receive an arithmetical certification of the results [42] does not mean that the union has any *right* to participate, nor that the Board must delay the safeguards that 8(b)(7)(C) was designed to extend to the employer because of the possibility that a union may file a futile and dilatory petition for an election it cannot win and in which the union often may not even participate. It should also be noted that 9(c)(1), after specifying certain requirements for filing petitions relating to certification, additionally provides that the Board is not required to hold a hearing or to direct an election unless it first finds that "a question of representation . . . exists . . . ." It is hard to find that a question of representation exists if the petitioner is disqualified from being certified as a representative.

The necessary consequence of our decision is that only groups eligible to be recognized can picket for recognition or take advantage of the up to thirty day "grace period" provided in 8(b)(7)(C) for recognitional picketing. The reasonableness of this result suggests that it is in fact a far more rational and plausible interpretation of the congressional intent in legislating the Landrum-Griffin Act than the tortured construction that Petitioner would have us adopt. Throughout paragraph 8(b)(7), Congress was explicitly concerned with the problems of recognitional picketing [43]; and it is far-fetched to argue that it implicitly intended to establish a special procedure to allow non-recognizable unions to engage in such picketing. Prima facie it would seem logical to assume that such unions would be precluded from such picketing. It would

---

40. 553 F.2d at 1377.

41. *Id.* The court cites *NLRB v. Local 542, International Union of Operating Engineers*, 331 F.2d 99 (2d Cir.), *cert. denied*, 379 U.S. 889, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964) as authority that a union that cannot be certified as the collective bargaining agent cannot engage in picketing for recognition without violating 8(b)(7)(C).

42. *E. g., Burns International Detective Agency, Inc.*, 138 NLRB 449 (1962).

43. *See* Meltzer, op. cit., *supra* note 32; Cox, *The Landrum-Griffin Amendments to the National Labor Relations Act*, 44 Minn.L.Rev. 257, 262–270 (1959).

require a much more affirmative statutory statement than we find in the Landrum-Griffin Act for us to agree that Congress had intended to establish as unlikely a procedure—a procedure in which, despite Congress' tying the strictly limited opportunity for recognitional picketing it provided to the expedited holding of an election,[44] a union unable to participate in such an election would be granted recognitional picketing privileges—as Petitioner suggests we should discover here.

The Board's position on the status of 8(b)(7)(C) petitions is more consonant with the underlying purpose of the Landrum-Griffin Act than is Petitioner's. The objective of subsection 8(b)(7)(C) was to provide *employers* the relief afforded by an expedited election process in order to reduce the harassment of recognitional picketing, so that they in turn would not coerce employees to join unwanted unions.[45] It would be a complete distortion of the legislative intent to allow the election petition, designed to protect the employer, to become a vehicle for allowing a month of recognitional picketing by a body which could never become a certified representative. The Landrum-Griffin Act may well have been, as the Union insists, the result of a legislative compromise—so indeed is most legislation; but the basic thrust of the portions of the statute considered here was clearly alleviating the hardships caused to employers by the unfair labor practices of unions. This being the case, it is hard to credit Petitioner's suggestion that Congress meant in 8(b)(7)(C) to provide a method by which unions, foreclosed from recognition, could be granted an opportunity to harass employers through recognitional picketing. One would more probably expect an absolute bar on such picketing by uncertifiable

unions than an elaborate—and inexplicit—provision for its occurrence.

The fact that 8(b)(7)(C) states that the Board shall order an election "without regard to the provisions of section 9(c)(1)"—does not mean that the Board must hold elections even where the union is foreclosed from certification, but only that it should not go through the time-consuming process of investigating to determine whether "a question of representation affecting commerce" exists. This provision seems intended to protect the employer by assuring expedition of the election process, not to force the Board to conduct meaningless elections and employers to endure up to a month of futile picketing. If the union involved is certifiable, the NLRB is directed to hold an election without further inquiry; but the Board need not blink at the fact that the union is disqualified on its face, *i. e.,* no "question of representation . . . exists" (*see* 9(c)(1)). Were this an issue of first impression we would be inclined to agree with the NLRB's interpretation of the interrelationship of 8(b)(7)(C) and 9(c)(1); and we certainly see no reason to overrule either the previous decisions of the Board or to suggest overruling our own recent opinion on this issue.

### III

The mere fact that subparagraph 8(b)(7)(C) covers threats to picket as well as actual picketing will not alone bring Petitioner's conduct within the purview of the Act unless there was a recognitional or organizational objective underlying the Union's activity.[46] It is well settled that picketing merely to protest substandard working conditions is not an unfair labor practice under 8(b)(7)(C).[47] Thus, a threat to

---

**44.** 8(b)(7)(C) establishes a "comprehensive code" restricting recognitional and organizational picketing, *NLRB v. Drivers, Chauffeurs, Warehousemen & Helpers, Local 639 (Curtis Bros.),* 362 U.S. 274, 291, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960). A purpose of the Landrum-Griffin Act was to impose "drastic limitations" on recognitional and organizational picketing, *Department and Specialty Store Employees, Local 1265 v. Brown,* 284 F.2d 619, 626

(9th Cir. 1960), *cert. denied,* 366 U.S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846 (1961).

**45.** *See* note 44 *supra. See also Cox,* op. cit., *supra* note 43, at 262–270.

**46.** *See* note 2 *supra.*

**47.** *Local 741, United Association of Plumbers (Keith Riggs Plumbing),* 137 NLRB 1125, 1126

engage in such picketing would also not be an unfair labor practice, and Petitioner maintains that the picketing it threatened was designed as just such a protest, not to secure recognition for the Union.[48] The NLRB, however—despite the protestations of the Union—determined that there was a recognitional object in Petitioner's conduct.[49] As this determination is a question of fact, it must be upheld here if it is supported by substantial evidence.[50]

There can be no question but that there was substantial evidence in support of the Board's findings concerning the Union's motivation. It is not necessary that the organizational or recognitional motive be either the sole or even the predominant objective behind the conduct alleged to violate subparagraph 8(b)(7)(C).[51] This provision of the Landrum-Griffin Act applies so long as recognition or organization is even one among many objectives in the picketing or threat to picket, and it would strain credulity to maintain that recognition was not an objective here. A short description of the NLRB's evidence in this regard suffices to demonstrate that substantial evidence supported the Board's decision.

The evidence of substandard conditions at the Company which allegedly moved Petitioner to threaten picketing was unclear and not particularly convincing in the first instance,[52] and even this information was refuted to some extent by the president of the Company at his conference with the Union's attorney. It is unlikely, and the Board was certainly justified in refusing to believe, that Petitioner was motivated to threaten picketing exclusively by such dubious evidence of substandard conditions at the Company. Indeed, the letter in which the Union threatened A–1 Security with picketing also contained a first request for the type of information which the Union would need in order to know with confidence whether in fact the Company fell below the area standard.[53] Clearly this fact suggests that it was at least not solely information concerning the conditions of employment at the Company which had elicited the Petitioner's threat to picket.

Not only is the evidence of area standards violations by the Company so sketchy that it is hard to believe that the Union would in fact have relied on it alone in deciding to threaten picketing, but also the NLRB had ample indications that a recognitional motive was in fact at work. During the conference with the President of A–1 Security, Petitioner's lawyer was blunt in his encouragement to the Company to deal with the Union, and went so far as to emphasize the advantages to the employer of doing so and the retaliatory action that would attend a refusal to cooperate with

(1962); *Houston Building & Construction Trades Council (Claude Everett Construction Co.)*, 136 NLRB 321, 323 (1962).

48. Petitioner's Brief at 15–21.

49. J.A. 7–11.

50. *San Francisco Local Joint Executive Board of Culinary Workers v. NLRB*, 163 U.S.App. D.C. 234, 238–239, 501 F.2d 794, 798–99 (1974); *National Packing Company v. NLRB*, 377 F.2d 800, 803 (10th Cir. 1967); *Cox*, op. cit., *supra*, note 43, at 266–67.

51. *San Francisco Local Joint Executive Board of Culinary Workers v. NLRB*, 163 U.S.App. D.C. 234, 239 n.9, 501 F.2d 794, 799 n.9 (1974); *Dallas Building and Construction Trades Council v. NLRB*, 130 U.S.App.D.C. 28, 33, 396 F.2d 677, 682 (1968).

52. The Board and the Trial Examiner both found that at the times Petitioner threatened picketing it lacked sufficient information to determine that the wages or benefits of the Company were substandard. J.A. 7. For example, although the Company's wage schedule was somewhat below standard, the Union did not inquire into possible fringe benefit over and above that usually provided or into the total labor cost to the Company. A recognitional motive can be inferred from the failure of a union to make a legitimate attempt to determine if conditions are substandard, *NLRB v. United Brotherhood of Carpenters and Joiners of America, Local 745*, 450 F.2d 1255, 1257–58 (9th Cir. 1971); *Centralia Building and Construction Trades Council v. NLRB*, 124 U.S. App.D.C. 212, 214, 363 F.2d 699, 701 (1966).

53. In this letter the Union made a formal request for information concerning hourly wages, fringe benefits, and wage progression.

the Union.[54] It is true that the Union's correspondence with A–1 Security explicitly disclaimed any Union interest in reaching a contract with the Company,[55] but such self-serving avowals need not necessarily be credited,[56] and the NLRB was clearly acting within its statutory authority and on substantial evidence when it refused to take these remarks at face value. In this connection it is a fact of some consequence that the same Union and lawyer had recently been found in violation of 8(b)(7)(C) in a case where their correspondence with the company involved made similar ritualistic disclaimers of recognitional motives.[57] The Union may well have been acting partly out of concern over what it believed to be the possibility of substandard working conditions at A–1 Security, but this is insufficient to immunize Petitioner from liability under the Landrum-Griffin Act.[58] Moreover, even if the Union's object was not to gain formal recognition, a union's purpose is deemed "recognitional" where it attempts to force its collective bargaining agreement upon persons it does not represent.[59] Petitioner's insistence that the Company live up to its own "Blue Book" standards may reasonably be so characterized.[60] The NLRB cites other evidence probative of the recognitional aspects of the Union's threats to picket,[61] but we find it unnecessary to discuss the further points they raise, because the few we have mentioned provide ample proof that the Board acted upon substantial evidence.

Finding that threats to picket are regulated under subparagraph 8(b)(7)(C); that a union disqualified from certification as a recognized collective bargaining agent may not engage in recognitional or organizational picketing "for a reasonable period not to exceed thirty days" under the provisions of 8(b)(7)(C); and that substantial evidence supported the Board's determination that the picketing which Petitioner threatened in this case was motivated at least in part by a recognitional objective, we deny the Union's petition and grant the Board enforcement of its order.

*So ordered.*

J. SKELLY WRIGHT, Circuit Judge, dissenting:

I respectfully dissent, for the reasons stated by then Chairman (now Member) Murphy and then Member (now Chairman) Fanning of the National Labor Relations Board. *See General Service Employees Union Local No. 73*, 224 NLRB 434, 437–440 (1976).

---

**54.** J.A. 38.

**55.** The letter referred to in the text at note 53 opened: "Please be advised as indicated previously that General Service Employees Union, Local No. 73, AFL–CIO, has no desire to have you execute a contract with our Local. Our only concern with your agency is that you provide benefits for your employees which meet prevailing standards established by a contract between Local 73 and a number of guard companies that it has under contract."

**56.** *NLRB v. Carpenters Local No. 2133, United Brotherhood of Carpenters and Joiners of America*, 356 F.2d 464, 465–66 (9th Cir. 1966); *NLRB v. Local 182, International Brotherhood of Teamsters*, 314 F.2d 53, 58–59 (2d Cir. 1963).

**57.** *See* text at note 8 *supra.*

**58.** *See* note 51 *supra.*

**59.** *Retail Clerks International Ass'n, Local Union No. 899 (State Mart, Inc.)*, 166 NLRB 818, 822–23 (1967), enforced per curiam, 404 F.2d 855 (9th Cir. 1969); *accord, Centralia Building & Construction Trades Council v. NLRB*, 124 U.S.App.D.C. 212, 213–214, 363 F.2d 699, 700–701 (1966).

**60.** The "Blue Book" was, after all, the text of the Union's collective bargaining agreement with other employers, *see* note 4 *supra.*

**61.** For example, the testimony of the Union's lawyer at the hearing before the Trial Examiner was facially inconsistent and revealed that his recollection of his conference with the Company's President, which allegedly convinced him of the substandard conditions at A–1 Security, was vague and lacking in the sort of "hard facts" necessary to demonstrate area standards inadequacies. Respondent's Brief at 47–48.