**Alberta E. BURNS, on behalf of herself and all others similarly situated, Petitioner,**

v.

**UNITED STATES RAILROAD RETIREMENT BOARD.**

No. 81–2293.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1982.

Decided Feb. 25, 1983.

---

**13.** Our decision on the merits of petitioner Burns's case appears in a companion opinion issued today.

Gil Deford, Los Angeles, Cal., for petitioner.

Thomas W. Sadler, Gen. Atty., Railroad Retirement Bd., Chicago, Ill., with whom Dale G. Zimmerman, Gen. Counsel, and Edward S. Hintzke, Asst. Gen. Counsel, Railroad Retirement Bd., Chicago, Ill., were on the brief, for respondent.

Before MacKINNON and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge MacKINNON.

1. When both spouses are covered as primary beneficiaries under the SSA, dual benefits are not available. Petitioner Burns, had her spouse engaged in employment covered by the SSA rather than the RRA, would not have been entitled to payments exceeding the amount due under her own account *or* the amount due derivatively under her husband's account. In effect, she could obtain the higher of the two benefits (her own primary benefit *or* a derivative benefit as surviving spouse of a covered worker), but she could not receive both. *See* 42 U.S.C. § 402(k)(3)(A). *See generally* Blumberg, *Adult Derivative Benefits in Social Security,* 32 Stan.L.Rev. 233, 240–41 (1980); Martin, *Social Security Benefits for Spouses,* 63 Cornell L.Rev. 789, 795–801 (1978); Note, *Women and Social Security: Seizing the Moment for Change,* 70 Geo.L.J. 1563, 1568, 1571–73 (1982).

Phase out of dual benefits for RRA annuitants commenced in 1974. *See United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 168–70, 101 S.Ct. 453, 455–57, 66 L.Ed.2d 368 (1980). In 1981, Congress accelerated the phase out. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 1119(d)(2), (h)(4), 95 Stat. 633, 635–36; *see* S.Rep. 139, 97th Cong., 1st Sess. 914–15, *reprinted in* 1981 U.S. Code Cong. & Ad.News 396, 938–39 (dual benefits for RRA survivor annuitants eliminated except for recipients whose entitlement was determined prior to August 13, 1981).

2. RRA citations in this opinion, unless otherwise stated, are to the Railroad Retirement Act of 1974, which became effective January 1, 1975. Pub.L. No. 93–445, 88 Stat. 1305 (1975)

GINSBURG, Circuit Judge:

Petitioner, Alberta Burns, is a retiree who ranks within a special and dwindling category of social insurance recipients. She is a dual beneficiary. She receives primary benefits, on her own account, as a retired worker covered under the Social Security Act (SSA). She also receives derivative benefits as the surviving spouse of a worker covered under the Railroad Retirement Act (RRA).[1] The SSA requires the reduction of a recipient's benefits by one dollar for every two dollars of income the recipient earns in excess of a statutorily defined exempt amount. 42 U.S.C. § 403(b). The RRA incorporates the SSA excess earnings provision by reference. 45 U.S.C. § 231a(g)(2).[2] If the two fifty percent offset provisions, the one in the SSA and one in the RRA, are separately applied to each of the benefits a dual beneficiary receives, income earned in excess of the exempt amount[3] will yield, in

(codified at 45 *U.S.C.* § 231 *et seq.*). For the year involved in this case, 1974, the Railroad Retirement Act of 1937 remained in effect. The excess earnings provision in the 1937 Act, 45 U.S.C. § 228e(i)(1)(ii), was carried over to the 1974 Act virtually unchanged. *See* 45 U.S.C. § 231a(g)(2).

3. The RRA offset provision originally applied to earnings in excess of $25 per month. Act of July 31, 1946, Pub.L. No. 79–572, § 213, 60 Stat. 722, 731. The exempt amount was raised to $50 per month in 1951, Act of Oct. 30, 1951, Pub.L. No. 82–234, § 20, 65 Stat. 683, 687, and to $75 per month in 1952, Act of July 18, 1952, Pub.L. No. 82–590, § 6(d)(2), 66 Stat. 767, 777.

Since 1954, the RRA has incorporated by reference the SSA definition of excess earnings. In that year, the SSA monthly limitation was replaced by an annual earnings limit of $1200. Social Security Amendments of 1954, Pub.L. No. 83–761, § 103(d)(2), 68 Stat. 1052, 1073.

From 1960 to 1972, a two-part definition of excess earnings applied. *See infra* note 4. In 1974, the year involved in this case, a beneficiary under the RRA or the SSA could earn up to $2400 a year without losing any benefits. *See* Social Security Amendments of 1972, Pub.L. No. 92–603, § 105(a)(3), 86 Stat. 1329, 1341. In 1977, Congress amended the SSA to provide for annual incremental increases in the exempt earnings amount; by 1982 a beneficiary could retain without any offset $6000 in earnings. Social Security Amendments of 1977, Pub.L. No. 95–216, § 301(c)(1), 91 Stat. 1509, 1530.

total, a one hundred percent or a dollar-for-dollar offset.[4]

In 1974, petitioner Burns earned $3800. The exempt amount that year was $2400. Thus, her excess earnings amounted to $1400. She reported her 1974 earnings to the Social Security Administration (Administration) and that agency deducted $744 from her social security benefits in 1976.[5] Two years later, the Railroad Retirement Board (Board) offset $700 against petitioner Burns's 1978 railroad retirement benefits to account for her excess earnings of $1400 in 1974. AR at 31–34. Burns unsuccessfully contested the Board's action through administrative channels. *In re Alberta E. Burns,* Railroad Retirement Act Claims Appeal Docket No. 1883. As authorized by 45 U.S.C. §§ 231g, 355(f), she now petitions this court to review the Board's December 11, 1980, decision rejecting her claim for recovery of the $700 deducted from her 1978 benefits.

Burns sought to proceed here on behalf of a class. Our decision denying her motion for an order certifying the class and granting the Board's motion to dismiss the class element of the petition appears in a companion opinion. *See Burns v. United States Railroad Retirement Board,* 701 F.2d 189 (D.C.Cir.1983).

Initially, Burns challenges the Board's offset as contrary to the intent of Congress. If the Board correctly applied its governing statute, she argues alternately, the resulting dual offset is unconstitutional because it contravenes the equal protection principle. Finally, she urges that even if her statutory interpretation and constitutional arguments fail, the Board acted impermissibly in rejecting her request for waiver of the $700 recovery.

Petitioner Burns maintains principally that separate and independent excess earnings offsets by the Administration and the Board leave a dual beneficiary without any fruit from her labors; the dollar-for-dollar offset, she emphasizes, removes all incentive to earn more than the exempt amount.

---

**4.** Between 1946 and 1960, a recipient of an RRA survivor's annuity would lose a dollar in benefits for every dollar earned over the exempt amount, in effect a 100% offset. In 1960, Congress amended the SSA, and by reference the RRA, to provide that, on earnings between $1200 and $1500 per year, benefit recipients would lose only one dollar for every two dollars earned, a 50% offset. Social Security Amendments of 1960, Pub.L. No. 86–778, § 211(e), 74 Stat. 924, 956. Earnings in excess of $1500 remained subject to a 100% offset against benefits. Thereafter, Congress repeatedly raised both the exempt amount, *see supra* note 3, and the level of earnings subject to the 50% offset, *see* Social Security Amendments of 1961, Pub.L. No. 87–64, § 108, 75 Stat. 131, 140 (50% applicable to earnings between $1200 and $1700); Social Security Amendments of 1965, Pub.L. No. 89–97, § 310, 79 Stat. 286, 380 (50% applicable to earnings between $1500 and $2700); Social Security Amendments of 1967, Pub.L. No. 90–248, § 107, 81 Stat. 821, 834 (50% applicable to earnings between $1680 and $2880). In 1972, Congress extended the 50% offset to all earnings in excess of the statutory exempt amount. Social Security Amendments of 1972, Pub.L. No. 92–603, § 105, 86 Stat. 1329, 1341.

The court questioned counsel for the Board at oral argument concerning the agencies' practice with respect to dual beneficiaries during the years when a 100% offset applied to all or part of income earned in excess of the exempt amount:

Q: What's your answer to that question [whether dual beneficiaries in fact lost two dollars in benefits for each dollar of excess earnings]?

A: The answer is that before the fifty cents on the dollar, there would have been a dollar taken out on one side and a dollar taken out on the other side.

. . . .

Q: Your answer to the question is, when social security had a 100% offset and when railroad retirement had a 100% offset, a woman in Mrs. Burns's position would be subject to a 200% offset?

A: No, she would keep working until she lost her benefits on both sides.

Q: Yes, but, for every dollar that she earned over the earnings limit, two dollars would come out of benefits?

A: That's correct, that's correct.

Of course, in no event would a dual beneficiary stand to lose more than the amount of her social insurance benefits.

**5.** The recoupment notice sent to petitioner Burns by the Administration listed her 1974 earnings as $3888 (apparently an $88 overstatement), placing her $1488 over the $2400 exempt amount then effective, and yielding $744 as the benefit offset. Administrative Record (AR) at 35–36.

But the laws that entitle her to dual benefits, on their face, also exact dual offsets. Because we do not believe a court is at liberty to excise either offset or to require the Administration and Board to coordinate deductions, each taking away less than its governing statute authorizes, we cannot embrace Burns's statutory construction or constitutional arguments. Nonetheless, we disagree with the Board's disposition of this case. For the reasons stated in part III of this opinion, we reverse the determination that petitioner Burns was "at fault" in causing the Board to overpay her $700, and instruct the Board to decide on remand whether recovery of the overpayment should be waived under the RRA's "purpose of [the Act]" or "equity or good conscience" standard. See 45 U.S.C. § 231i(c) (Board shall not recover overpayment to individual who is "without fault" if recovery "would be contrary to the purpose of [the Act] . . . or would be against equity or good conscience").

## I. THE EARNED INCOME OFFSET PROVISIONS AND THEIR APPLICATION TO DUAL BENEFICIARIES

▮ The Social Security Act provides that "[d]eductions . . . shall be made from any payment or payments under this subchapter to which an individual is entitled . . . if for such month he is charged with excess earnings, under the provisions of subsection (f) of this section," 42 U.S.C. § 403(b); subsection (f), in turn, states that "an individual's excess earnings for a taxable year shall be 50 per centum of his earnings for such year in excess of [the exempt amount]," 42 U.S.C. § 403(f)(3). The Railroad Retirement Act, since 1954, has incorporated the SSA offset provision by reference. Social Security Amendments of 1954, Pub.L. No. 83–761, § 401(d), 68 Stat. 1052, 1098. The RRA thus states that "[d]eductions . . . shall be made from any

payments to which a survivor is entitled . . . if for such month such survivor would be charged with excess earnings under section 403(f) of Title 42 . . . ." 45 U.S.C. § 231a(g)(2).

Petitioner Burns acknowledges the literal meaning of these texts; she recognizes that "both Acts provide for an offset." Brief for Petitioner at 18. She argues, however, that the court should reject "narrow, overly-literal interpretation which contradicts the Congressional intent and purpose underlying the enactment of these statutory provisions." Id. at 19. But a statute "as complex as the Social Security Act," Dissent at 212, reflects many legislative concerns and purposes. It oversimplifies, we believe, to ascribe a sole purpose to the statutory scheme at issue here.

The vast majority of retirees covered under the SSA or the RRA receive only one federal social insurance benefit. See supra note 1. No doubt Congress had these single benefit retirees in view in 1972 when it revised the SSA's excess earnings formula (and, by reference, the RRA's) to reduce all benefit deductions from dollar-for-dollar to one dollar for every two. Social Security Amendments of 1972, Pub.L. No. 92–603, § 105(a)(3), 86 Stat. 1329, 1341; see supra note 4. The evidence is indeed "overwhelming" that Congress reduced the offset to encourage social security beneficiaries to work. See Dissent at 209–210, 213–214. However, there is no evidence that Congress envisioned but one offset for the retiree who receives two federal social insurance benefits. Rather, it appears that in 1972, the year the fifty percent formula was spread across the board,[6] as in preceding years, Congress did not advert specifically to the dual beneficiary's situation when it legislated offsets for earned income. See Dissent at 212.[7]

---

6. From 1960 until 1972, the 50% formula applied to a first tier of earnings above the exempt amount. See supra note 4.

7. The Railroad Retirement Act of 1937 originally provided a lump sum death benefit, but no monthly annuity, for survivors. Act of June

24, 1937, Pub.L. No. 75–162, § 5, 50 Stat. 307, 312. In 1946 survivors' annuities were introduced, but an individual situated as is petition-

Based on the "solicitude" Congress showed for gainfully-employed social security annuitants, *cf.* Dissent at 211–212, Burns urges that the work incentive purpose motivating the 1972 offset reduction should exclude an excess earnings toll greater than fifty percent for single and dual beneficiaries alike. But the provisions Congress put in place in the two statutes express the opposite. It is treacherous to brush aside the literal meaning of those provisions and, by riveting attention on work incentive, avoid forthright recognition of another concern on the mind of Congress. That concern relates to the appropriateness of allowing a retiree to collect two federal social insurance benefits. *See supra* note 1.

Congress initially prohibited RRA survivor annuitants from simultaneously receiving social security benefits; that restriction was repealed in 1955.[8] In 1951, the RRA was amended to eliminate dual benefits for employee annuitants; that amendment was repealed in 1954.[9] *See* D. Schreiber, Legislative History of the Railroad Retirement and Railroad Unemployment Insurance Systems 390–92 (1978) (detailed account of

shifting legislative positions on allowance of multiple benefits under RRA). Payment of these dual benefits "threatened the railroad retirement system with bankruptcy by the year 1981," *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 169, 101 S.Ct. 453, 456, 66 L.Ed.2d 368 (1980), and "prompt[ed] Congress [in 1974] to completely revise the Railroad Retirement Act to gradually eliminate dual benefits." Dissent at 204 n. 2. *See supra* note 1.

In light of the ambivalence of Congress regarding allowance of dual benefits, and the legislature's ultimate rejection of them, we do not venture to guess how Congress would have responded had it been asked the question this case poses in 1955, when dual benefits were allowed to persons situated as is petitioner Burns, or in 1972, when the excess earnings offsets were reduced across the board to fifty percent.[10] We note only that it can not be said with any secure support that Congress would have replied, "Yes, individuals who receive two benefits, like individuals who receive only one, should be subject to but one offset for nonexempt earnings."[11] While we offer no speculation

er Burns could not receive payments in excess of the amount authorized for the higher of the two benefits. She could receive only her own primary social security benefit and the amount, if any, by which her derivative railroad retirement annuity exceeded her social security benefit. Act of July 31, 1946, Pub.L. No. 79–572; § 213, 60 Stat. 722, 729–30. Dual entitlement to both a primary SSA benefit and a derivative RRA benefit, without offsetting one against the other, was first authorized in 1955. Act of Aug. 12, 1955, Pub.L. No. 84–383, § 2, 69 Stat. 715, 716 (repealing 45 U.S.C. § 228e(g)(2) (1952)).

The excess earnings offset evolved separately. It has figured in the RRA since 1946, Act of July 31, 1946, *supra,* 60 Stat. at 731, and was cast in its current shape, incorporating by reference the excess earnings provision of the SSA, in 1954. Social Security Amendments of 1954, Pub.L. No. 83–761, § 401(d), 68 Stat. 1052, 1098. *See* Dissent at 205 n. 4.

**8.** *See* Act of July 31, 1946, Pub.L. No. 79–572, § 213, 60 Stat. 722, 731, *repealed by* Act of Aug. 12, 1955, Pub.L. No. 84–383, § 2, 69 Stat. 715, 716. The Act of July 31, 1946, *supra,* also provided that an RRA survivor's annuity would be reduced by the amount of the beneficiary's primary RRA annuity. This dual benefit restriction was eliminated in 1954. Act of Aug.

31, 1954, Pub.L. No. 83–746, § 10, 68 Stat. 1038, 1039.

**9.** *See* Act of Oct. 30, 1951, Pub.L. No. 82–234, § 18, 65 Stat. 683, 686, *repealed by* Act of June 16, 1954, Pub.L. No. 83–398, 68 Stat. 250.

**10.** *See supra* note 4.

**11.** *Cass v. United States,* 417 U.S. 72, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974), is hardly an "identical" case. *See* Dissent at 208–209 nn. 14, 15. The Court there dealt with conflicting *express* provisions in the same statute. The same is true of *Bahre v. Hogbloom,* 162 Conn. 549, 295 A.2d 547 (1972), featured in Dissent at 214 n. 31. Here, by contrast, there is no clash of express provisions; there is, rather, a silence, a circumstance "never contemplated by the legislature." *Id.* at 212. Nor is *Freeman v. Harris,* 625 F.2d 1303 (5th Cir.1980), cited in Dissent at 214, a precedent closely in point. The offset in that case was unrelated to earned income, the Secretary's policy regarding workers with three statutory entitlements left them with fewer benefits than they would have received if they held only two entitlements, and the policy thwarted the overriding purpose of Congress to render state workers' compensation programs the prime providers of benefits.

as to what solution the legislature would have adopted had it specifically adverted to this case, we point out that on at least two occasions, information was placed before Congress concerning the double offset contested here.

First, in a 1972 report to the House Committee on Interstate and Foreign Commerce, the Commission on Railroad Retirement, established by Congress in 1970 to recommend changes in the financially troubled system, described the RRA's then effective "survivor beneficiaries earnings test" as

> equivalent to the social security earnings test—which reduces the beneficiary's annuity by one dollar for every two earned between [the applicable amounts], thereafter on a dollar-for-dollar basis. *Dual beneficiaries are, of course, subject to the various social security work clauses on their dual benefits.*

H.R.Doc. No. 350, 92d Cong., 2d Sess. 385 (1972) (emphasis supplied). Second, in 1976, a bill introduced in the House of Representatives proposed "amend[ing] the Railroad Retirement Act of 1974 to provide that amounts of excess earnings with which a social security benefit is charged shall not be used in making deductions from widows' benefits under the railroad retirement system." H.R. 14153, 94th Cong., 2d Sess. (1976). The proposed amendment would have achieved through legislation what petitioner Burns asks the court to order. We agree with Burns that introduction of this bill does not indicate legislative acquiescence in the Administration's and Board's position that dual benefits attract dual offsets, *see* Dissent at 210 n. 19, but the proposal does suggest that at least some members of Congress were cognizant of the agencies' position.[12]

Since we cannot divine the lawmakers' will with respect to the special and only category of retirees the instant petition de-

scribes—recipients of dual benefits—we return to the scheme Congress adopted. *Cf. Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive."). The RRA authorizes petitioner Burns to retain her social security benefit in full while collecting her railroad retirement annuity in full. *See supra* note 7. Each Act calls for an identical earned income offset against benefits under that Act. Literal application of each offset provision is not readily labeled "eccentric," "absurd," or "unreasonable." *But cf.* Dissent at 206–208 & nn. 11–13. Congress might well have considered a double offset a fitting match for a double benefit. The second offset for the dual beneficiary ameliorates the disparity in benefits received by similarly situated surviving spouses (persons covered by social insurance both on their own account and as spouses of covered workers), most of whom qualify for only one benefit. *See supra* note 1. In addition, dual recoupments, when a dual beneficiary's earned income exceeds the exempt amount, accord with the discrete character Congress still orders for the railroad retirement and social security funds. Further, there is nothing inherently arbitrary about a dollar-for-dollar offset; Congress could reasonably conclude that retired persons who earn income do not have the need fully retired persons have for replacement of pre-retirement income. In sum, while the wisdom of a dual or dollar-for-dollar offset is indeed debatable, "we think it clear that Congress could rationally choose to adopt such a course." *Weinberger v. Salfi,* 422 U.S. 749, 781, 95 S.Ct. 2457, 2474, 45 L.Ed.2d 522 (1975).

We note finally that even if we agreed with petitioner Burns that Congress unquestionably would have specified a fifty

12. This case is not the first nor the only current court challenge to the agencies' literal reading of the offset provisions. A case similar to this one is sub judice. *Linquist v. Schweiker,* No. 80–0698–CV–W (W.D.Mo. filed July 31, 1980). *See Burns v. United States Railroad Retirement*

*Bd.,* at 192 n. 11 (D.C.Cir.1983). For an earlier effort, *see Finnerty v. Cowan,* 508 F.2d 979 (2d Cir.1974), *on remand,* No. 73–CV–206 (N.D. N.Y.1976) (district court upheld against constitutional challenge dual offsets for dual beneficiaries).

percent solution had it focused on her situation, we would find her petition problematic. At bottom, her statutory construction argument invites the court to order adjustments of the kind appropriately left to legislative determination. *Cf. Califano v. Westcott,* 443 U.S. 76, 91–93, 99 S.Ct. 2655, 2664–65, 61 L.Ed.2d 382 (1979). Questions such as these arise: Should one or the other of the two offset provisions be excised for persons situated as Burns is? Which offset, if either, would Congress have eliminated? Burns suggests, as one possible solution, a sequential rather than a simultaneous offset: first, an offset of fifty percent of her 1974 earnings over $2400 against her social security benefits, then a further offset of fifty percent against her railroad retirement benefits in the event she earned over $4800. Brief for Petitioner at 31–32. She proposes as the preferable solution forfeiture of fifty percent of her excess earnings "to the two agencies." *Id.* at 32.

The precise adjustment appropriate to bring the offset provisions in line with what petitioner Burns sees as the sole design of Congress is not immediately apparent. Her invitation for court-ordered amendment of one or both of the implicated statutory subsections involves "fine tuning" the judiciary should not undertake, "definitional and policy questions" judges are ill-equipped to resolve. *Compare Califano v. Westcott, supra,* 443 U.S. at 92, 93, 99 S.Ct. at 2664, 2665, *with id.* at 95 & n. 1, 99 S.Ct. at 2666 & n. 1 (Powell, J., dissenting). She cites no precedent in support of judicially-directed revision of legislation of the character in which she would have the court indulge.[13]

In sum, despite the appeal of petitioner Burns's position, we are persuaded that hers

is "a legislative, and not a legal, argument." *Schweiker v. Wilson,* 450 U.S. 221, 238, 101 S.Ct. 1074, 1084, 67 L.Ed.2d 186 (1981).

## II. THE CONSTITUTIONALITY OF DUAL OFFSETS

Petitioner Burns asserts that separate fifty percent excess earnings offsets exacted by the Administration and the Board violate the equal protection component of the Fifth Amendment's due process clause. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975). What we have said concerning the rationality of dual offsets as a match for dual benefits essentially disposes of her Constitution-based argument. *See supra* pp. 198–199.

The discrimination against dual beneficiaries alleged here does not rest on a characteristic, such as race or sex, triggering strict or heightened judicial scrutiny. *Cf. Wengler v. Druggists Mutual Insurance Co.,* 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980) (workers' compensation scheme's gender-based discrimination violates equal protection); *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (gender-based discrimination in social security program violates equal protection). Rather, as Burns acknowledges, social legislation of this sort, when no suspect or near-suspect classification is involved, attracts a "significant presumption" of constitutionality. Brief for Petitioner at 38. *See Schweiker v. Wilson, supra,* 450 U.S. at 230, 101 S.Ct. at 1080. Plausible reasons support dual offsets when a federal social insurance recipient is allowed dual benefits. *See su-*

---

**13.** When courts do adjust statutes because a constitutional infirmity makes the task unavoidable, they choose between straightforward extension and invalidation. Because judges in such cases act only provisionally, they use primary colors and do not attempt shading in adjusting the legislature's design. *See Califano v. Westcott, supra.*

The solution the Dissent proposes leaves it not to the legislature, but to the Administration and the Board "to coordinate their reduction of benefits for excess earnings." Dissent at 213 n. 30. As demonstrated by this case, the Dis-

sent notes, *id.,* the two agencies share information regarding beneficiaries' reports of excess earnings. But sharing information differs markedly from agreeing not to use the offset formula directed by each agency's governing statute and cooperating to replace the statutory formula with another of the agencies' making, one that will yield smaller returns to the funds the agencies administer. If the adjustments in question are not within the judicial province to devise, the task is not properly delegated by the court to executive agencies.

pra pp. 198–199. The "rational basis" criterion applicable here requires no more. *See United States Railroad Retirement Board v. Fritz, supra,* 449 U.S. at 179, 101 S.Ct. at 461 ("Where . . . there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision,' [citation omitted] because this Court has never insisted that a legislative body articulate its reasons for enacting a statute."). Sympathy for the circumstances of a complainant, or a belief that the legislation reviewed advances unsound policy, does not permit a court to deviate from this highly deferential standard. *See, e.g., Califano v. Boles,* 443 U.S. 282, 99 S.Ct. 2767, 61 L.Ed.2d 541 (1979); *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977); *Mathews v. De Castro,* 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976). *See also Yost v. Schweiker,* 545 F.Supp. 591 (D.S.D.1982) (citing *Fritz* as controlling precedent and upholding SSA provision dictating that spouse divorced after marriage of 42 years is disqualified from receiving benefits under both SSA and RRA).

III. Petitioner's request to waive recovery of the asserted overpayment

■ In 1978, the Board fully recouped the asserted $700 overpayment attributed to petitioner Burns's 1974 earnings above the $2400 exempt amount. Thereafter, upon obtaining legal assistance, Burns petitioned the Board to waive recovery under section 10(c) of the Railroad Retirement Act, which provides, in pertinent part:

There shall be no recovery in any case in which more than the correct amount of annuities or other benefits has been paid . . . to an individual . . . who, in the judgment of the Board, is without fault when, in the judgment of the Board, recovery would be contrary to the purpose of [the Act] . . . or would be against equity or good conscience.

45 U.S.C. § 231i(c).[14] The Board denied the waiver request;[15] it ruled that, because petitioner Burns did not report her 1974 earnings to the Board (although she did report them to the Social Security Administration), she was "at fault in causing the overpayment," AR at 4, therefore she was ineligible for a waiver. We conclude that the Board's attribution of fault to Burns is not supported by substantial evidence.[16] Accordingly, we vacate the order here on review and remand the case to the Board with instructions to grant the waiver request if the Board determines, in accordance with section 10(c), that recoupment from petitioner Burns is not impelled by the purpose of the Act or by equity or good conscience. *See, e.g., Hays v. Finch,* 306 F.Supp. 115 (W.D.Pa.1969).

A. *The fault attribution*

The Board acted to recoup benefits paid to Burns precisely because she reported her 1974 earnings: her report to the Social Security Administration caused that agency to recoup $744 by suspending her social security benefits for more than two months in

14. For other benefit statutes specifying the same standards for recoupment waiver see 10 U.S.C. §§ 1442, 1453 (service member's family annuity and survivor's benefits); 42 U.S.C. § 1383(b) (supplemental security income) (also allowing waiver if de minimis recovery would "impede efficient or effective administration" of the statute); 42 U.S.C. § 1395gg(c) (Medicare). Some statutes do not refer to the purpose of the legislation but simply authorize waiver of recoupment absent fault on the recipient's part, and if not inconsistent with equity and good conscience. *E.g.,* 5 U.S.C. § 8346(b) (federal pension); 38 U.S.C. § 3102(a) (veterans' benefits). Others specify, in addition to an equity/good conscience standard, a further criterion such as "[not] against the public inter-

est," *e.g.,* 5 U.S.C. § 5922(b)(2) (foreign station allowances), 5 U.S.C. § 4108(c) (civil service training expenses), or "in the best interest of the United States," *e.g.,* 10 U.S.C. § 2774(a) (military pay).

15. Burns's waiver request was rejected at three agency levels, first by the Bureau of Retirement Claims, AR at 46, next by the Appeals Referee, AR at 15, and finally by the Board, AR at 3.

16. *See Williams v. United States Railroad Retirement Bd.,* 585 F.2d 341, 343 (8th Cir. 1978) (per curiam) (interpreting 45 U.S.C. § 355(f) "supported by evidence" standard to mean "substantial evidence").

1976;[17] when the Administration reported those same earnings to the Board, it in turn recouped $700 two years later by suspending her survivor's annuity for four and one half months. AR at 31–34. In reviewing the Board's attribution of fault to petitioner Burns we proceed from the undisputed fact that she did not conceal her earnings.[18] Instead, she timely and accurately reported her earnings to the Social Security Administration, the government agency responsible for administration of her primary social insurance benefit.[19] Cf. *Rini v. Harris,* 615 F.2d 625 (5th Cir.1980) (fault lies with agency, not with recipient, when agency fails to provide clear, timely information concerning benefit entitlement).

The Board maintains, however, that Burns was at fault because she failed to twice report her earnings. She should have known, the Board contends, that the RRA required an offset for excess earnings separate from the social security offset, and a filing separate from the report she made to the Administration. To support its view of what Burns should have known and its consequent fault determination, the Board

points to two considerations. First, in 1969, when Burns filed her application for a survivor's annuity under the RRA, she received a pamphlet instructing her, *inter alia,* to report earnings over the exempt amount. *See* Brief for Respondent App. B.[20] At that time, she signed a printed form certifying that the pamphlet's contents had been explained to her and that she understood she must tell the Board of her earnings in excess of the exempt amount. *See* AR at 22. Second, in 1973, she was informed of a $26 RRA survivor's annuity overpayment occasioned by her excess earnings, *see* AR at 29; according to the Board, the 1973 notice should have alerted her to the need to report her 1974 earnings to both agencies.

Turning first to the Board's 1973 recoupment of $26 based on petitioner Burns's receipt one year of $53.60 in annual earnings over the exempt limit,[21] the asserted alert to Burns is not readily discerned. Nothing in the record indicates any corresponding SSA recoupment. Nor does the 1973 overpayment notice refer to any default on Burns's part in failing to report

---

**17.** *See supra* note 5.

**18.** *Cf., e.g., Minton v. Celebrezze,* 318 F.2d 429 (7th Cir.1963) (wife not bona fide employee; imputing to husband income listed as wife's brought husband over the statutory ceiling); *Gray v. Weinberger,* 397 F.Supp. 304 (W.D.Va. 1975) (recipient failed to disclose part-time employment on benefits application and thereafter failed to notify agency of gainful employment by completing and returning information cards mailed with disability checks).

The record includes two annual earnings reports Burns filed with the Board, one in 1970, the other in 1971, the first years she received benefits under the RRA. AR at 25, 27. There is no indication whether the Board, on its own initiative, supplied Burns with reporting forms for these or later years. Burns represented on both forms that she did not anticipate earning more than the exempt amount in the years the reports were filed. Although the Bureau of Retirement Claims and the Appeals Referee cited these reports, AR at 47, 16, reference to them is conspicuously absent from the Board's decision. We are persuaded, as perhaps the Board was, of their minimal probative value.

**19.** In 1974, according to the Board, Burns received approximately $275 per month in social security benefits based on her own earnings

record and approximately $137 per month in survivor's benefits under the RRA. Brief for Respondent at 8–9.

**20.** The pamphlet, out-of-date when given to Burns, stated that the Board "must withhold $1 of your annuity benefits for every $2 of yearly earnings over $1,500 and up to $2,700 and $1 of benefits for every $1 you earn over $2,700." Brief for Respondent App. B. In 1969, when Burns received the pamphlet, the applicable amounts were, respectively, $1680 and $2880. Social Security Amendments of 1967, Pub.L. No. 90–248, § 107, 81 Stat. 821, 834 (1968). As indicated *supra* note 4, 1972 amendments to the SSA eliminated the dollar-for-dollar offset then applicable once income reached the specified level, and made all excess earnings subject to 50% offset against benefits. This change became applicable automatically under the RRA. *See supra* note 3.

**21.** The 1973 notice makes no reference to the year of the earnings, *see* AR at 29, but both the Bureau of Retirement Claims, AR at 47, and the Board, AR at 4, attributed the overpayment to excess earnings in 1970. *But cf.* Brief for Respondent at 35 (asserting 1973 overpayment notice related to earnings in 1972).

earnings to the Board. AR at 29.[22] In short, this evidence of an alerting circumstance adequate to justify the Board's fault finding appears highly insubstantial.

While the pamphlet Burns received in 1969 did inform her of the fifty percent offset applicable under the RRA, it did not explain that the offset operated twice against a person in her situation. Rather, it simply conveyed that she would lose one dollar in benefits for every two dollars of yearly earnings above the statutory ceiling.[23] The Social Security Administration was no more enlightening. Indeed, after petitioner Burns reported her 1974 earnings to the Administration, the responsive overpayment notice she received informed her: "You will never have more than $1 in benefits withheld for each $2 of earnings above [the exempt level]." AR at 36.

Petitioner Burns stated in her waiver request that although she received the "handbook" from the Board, she did not read it. AR at 45. She noted the small type "difficult to read for the elderly." AR at 12.[24] And she stressed that all the information the Administration and Board gave her appeared "the same as to reporting requirements and withholding $1 for every $2." *Id.* She understood that the two benefits schemes were "coordinated with and by the Social Security Administration and the Railroad Retirement Board"; therefore, she "assumed that reporting her earnings to *either* government agency" satisfied her obligation to report. *Id.* Most pointedly, she said, "I never thought I would be charged twice for going over the limit and lose all that money I had earned or I would not have worked past the limit." AR at 45.

This court has divided on the question whether, under the governing statutes, Burns could "be charged twice for going over the limit," thereby "los[ing] all [the] money she had earned." In light of the division on the court, it is all the more difficult to charge her with fault for her understanding of the advice she received from the Administration and the Board concerning benefit offsets for excess earnings.[25] *Cf. Hays v. Finch, supra,* 306 F.Supp. at 120 (holding plaintiff not at fault in accepting a lump sum social security benefit a second time, observing that the agency's fault finding "might be appropriate if plaintiff were an accountant"). In sum, on the record this case presents, the Board's denial of a waiver to petitioner Burns on the ground that she was at fault is not tenable.

### B. *The remaining waiver criteria*

Since the Board held Burns at fault, it did not reach the further questions whether recoupment would conflict with the purpose of the Act or with equity or good conscience. *See* 45 U.S.C. § 231i(c). As to those standards, Board regulations, 20 C.F.R. § 255.12, list among factors meriting

---

**22.** In her statement to the Board, petitioner Burns said she had no recollection of the 1973 overpayment recovery. AR at 12.

**23.** In contrast to the pamphlet Burns received in 1969, the pamphlet employed by the Board since 1978 does alert dual beneficiaries that offsets for excess earnings apply twice:

If you are under age 72 and are applying for a survivor annuity, filing for a social security benefit may DECREASE the total benefit payable to your family if you expect to work and earn more than the ANNUAL EARNINGS EXEMPT AMOUNT. This is because *both your railroad retirement annuity and social security benefit are reduced for earnings above the annual exempt amount.*

Brief for Respondent at 32 n. 9 (capitalization in original, emphasis supplied).

**24.** *Cf. Gray Panthers v. Schweiker,* 652 F.2d 146, 169 (D.C.Cir.1980) ("Congress ... has repeatedly recognized that the elderly, as a group, are less able than the general populace to deal effectively with legal notices and written registration requirements ....").

**25.** It is not clear whether the Board believed that Burns's very "entitle[ment] to a social security benefit in 1970" constituted fair warning that she was exposed to a "double deduction." *See* AR at 4. The divided views of this court on whether the statutes call for a "double deduction" are indication enough that absent explicit notice that the offset would operate twice and that one report would not do, Burns should not be charged with fault for causing the overpayment by failing to report twice.

consideration at the time of a proposed recoupment:[26]

(d) The extent to which the individual is dependent upon the current payment of his annuity or pension for the necessities of life.

Similarly, Social Security Act regulations governing waivers provide that recoupment would "defeat the purposes of [the Act]" in

situations where the person from whom recovery is sought needs substantially all of his current income (including social security monthly benefits) to meet current ordinary and necessary living expenses.

20 C.F.R. § 404.508(b).

Judged by "hardship" considerations of this nature,[27] petitioner Burns's waiver request would appear compelling. At the time of recoupment, she was 74 years old and living entirely on her own social security benefits and her railroad survivor's annuity.[28] Her total monthly income from these benefits was $570, her monthly living expenses, $417.50. See AR at 44. The amount withheld by the Board for four and one half months constituted close to 25% of her monthly income. And the recoupment meant that she had labored for no monetary gain, although that was hardly her intention. See AR at 45.

The "hardship" waiver criteria, however, were not addressed by the Board, and the question is one for initial administrative determination subject to court review. We therefore remand this case to the Board for expeditious determination whether, in view of petitioner Burns's satisfaction of the "without fault" criterion, waiver of recovery would be consonant with the Act's purpose or with equity or good conscience.

*Reversed and remanded.*

MacKINNON, Circuit Judge, dissenting:

Petitioner, Alberta Burns, receives benefits under both the Railroad Retirement Act and the Social Security Act. Both Acts contain provisions which authorize the reduction of a recipient's benefits by $1 for every $2 of the recipient's "excess earnings" —those earnings which exceed a statutorily defined level each year. The Railroad Retirement Board (Board) and the Social Security Administration (Administration) both interpret these excess earnings provisions to permit them to reduce a recipient's benefits for excess earnings irrespective of whether the other agency has also reduced the recipient's benefits for the same earnings. As a result, individuals, such as petitioner, who receive benefits under both Acts are subject to a $1 reduction in benefits for each $1 of excess earnings, up to the total of benefits received.

Petitioner challenges a decision of the Board affirming the determination of an appeals referee that she was overpaid $700 in Railroad Retirement benefits in 1974 as a result of excess earnings that year, and that waiver of recovery of the overpayment by the Board was not appropriate. Prior to the Board's decision, the Administration had reduced petitioner's Social Security benefits because of her excess earnings in 1974. Petitioner asserts that the Board's interpretation of the excess earnings provisions defeats the intent of Congress and violates equal protection and due process under the Fifth Amendment. Alternative-

---

**26.** *See Hays v. Finch, supra,* 306 F.Supp. at 120 (financial condition inquiry should be directed to time of benefit suspension, not time of overpayment).

**27.** *See* AR at 42 (Director of Retirement Claims indicates as the relevant inquiry whether "[r]ecovery would cause a hardship to the annuitant").

**28.** *See Shannon v. United States Civil Serv. Comm'n,* 444 F.Supp. 354, 363 (N.D.Cal.1977), *aff'd in part, rev'd in part,* 621 F.2d 1030 (9th Cir.1980):

[T]he loss occasioned by recoupment should not be minimized. The deprivation of a significant portion of fixed income can be a substantial loss indeed. Retired individuals living on fixed income frequently can ill afford even a moderate temporary decrease in their disposable income.

*Cf. Henry v. Weinberger,* 371 F.Supp. 854, 856 (E.D.Mo.1973) (equity and good conscience not violated by recovery from individual "neither largely nor solely dependent on Social Security benefits for the necessities of life").

ly, petitioner argues that the Board erred in refusing to waive recovery of the overpayment of benefits.

The excess earnings provisions of the Railroad Retirement Act and the Social Security Act have a common purpose—ensuring that benefits are only paid to persons who are truly retired, while encouraging such persons to work to supplement their benefits. As such, the provisions of the two statutes must be read *in pari materia* to effectuate this clearly articulated purpose. I find that the Board's policy with respect to reducing benefits for excess earnings is a narrow, overly-literal interpretation of the excess earnings provisions which defeats the obvious intent of Congress in amending those provisions to encourage retired persons to work by reducing their benefits by only $1 for every $2 of excess earnings.[1] Accordingly, I would reverse the Board's decision and direct the Board to pay petitioner the $700 withheld from her benefits because of her 1974 earnings. Because the majority upholds the Board's interpretation of the excess earnings provisions, at 196–199, I respectfully dissent.

1. Because I find for petitioner on this basis, I do not reach the constitutional and waiver issues. I express no opinion on the majority's analysis of these issues.

   Petitioner also seeks to proceed on behalf of a class in this action. On that issue I concur in the separate opinion by Judge Ginsburg.

2. Prior to 1975, payment of Railroad Retirement benefits was governed by the Railroad Retirement Act of 1937, 45 U.S.C. §§ 228a to 228z–1 (1970 & Supp. IV 1974). At that time, individuals entitled to benefits under both the Railroad Retirement Act and the Social Security Act could receive more benefits than individuals entitled to benefits under only a single Act. *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 168 n. 1, 101 S.Ct. 453, 456 n. 1, 66 L.Ed.2d 368 (1980). Payment of these dual benefits led to a financial crisis in the Railroad Retirement program, prompting Congress to completely revise the Railroad Retirement Act to gradually eliminate dual benefits. Railroad Retirement Act of 1974, Pub.L. No. 93–445, 88 Stat. 1305 (codified as amended at 45 U.S.C. §§ 231–231u (1976 & Supp. IV 1980)). *See* H.R.Rep. No. 1345, 93d Cong., 2d Sess. 1–2, 7–12 (1974). The 1974 Act became effective on January 1, 1975. Railroad Retirement Act of 1974, Pub.L. No. 93–445, § 602, 88 Stat. 1305, 1360.

## I.

The Railroad Retirement Act[2] provides for payment of benefits to railroad workers who have satisfied work-related requirements, as well as to certain of their dependents and survivors. 45 U.S.C. § 231a (1976 & Supp. IV 1980). The program is financed by the contributions of both employers and employees and is administered by the Board, an independent agency of the United States. *Id.* § 231f. The Social Security Act establishes a program which provides similar benefits and is financed in a similar fashion, but is separately administered by the Administration pursuant to that Act. Social Security Act, 42 U.S.C. §§ 401–433 (1976 & Supp. IV 1980).

Both the Railroad Retirement Act and the Social Security Act provide that benefits will be reduced if a recipient has earnings which exceed a statutorily defined level in a year. Benefits under the Social Security Act are subject to a $1 deduction for every $2 of such excess earnings. 42 U.S.C. § 403 (1976 & Supp. IV 1980).[3] The

Insofar as is relevant to this case, the operative language of the 1937 Act and the 1974 Act is identical. *Compare* 45 U.S.C. § 231a(g)(2) (1976) (excess earnings provision for survivors' annuities under 1974 Act) *with* 45 U.S.C. § 228e(i)(1)(ii) (1970) (excess earnings provision for survivors' annuities under 1937 Act). Citations in this opinion are to the 1974 Act unless otherwise indicated.

3. 42 U.S.C. § 403(b) (1976) provides that

   Deductions, in such amounts and at such time or times as the Secretary shall determine, shall be made from any payment or payments under this subchapter to which an individual is entitled, and from any payment or payments to which any other persons are entitled on the basis of such individual's wages and self-employment income . . . if for such month he is charged with excess earnings, under the provisions of subsection (f) of this section . . . .

42 U.S.C. § 403(f)(1) (Supp. IV 1980) provides that

   For purposes of subsection (b) of this section—

   (1) The amount of an individual's excess earnings (as defined in paragraph (3)) shall be charged to months as follows: There shall be charged to the first month of such taxable year an amount of his excess earnings equal

Railroad Retirement Act also provides for a $1 deduction for each $2 of excess earnings by incorporating the excess earnings provision of the Social Security Act by reference. 45 U.S.C. § 231a(g) (1976).[4] Neither Act explicitly indicates how deductions for excess earnings are to be made if an individual receives benefits under *both* programs. Both Acts are silent with respect to individuals in that circumstance. Nevertheless, both the Board and the Administration read the excess earnings provisions literally and reduce the benefits they administer by 50 percent of excess earnings without regard to the 50 percent reduction imposed by the other agency. As a result, persons receiving benefits under both the Railroad Retirement Act and the Social Security Act have 100 percent of their excess earnings recovered by the agencies, until the deduction equals the total benefit received.

In 1974, petitioner was receiving survivors' benefits under the Railroad Retirement Act based on her deceased husband's work record, and primary benefits under the Social Security Act based on her own work record. That year she earned $3800, $1400 over the then existing statutory earnings limit of $2400.[5] Petitioner reported these earnings to the Administration and it deducted $744 from her benefits in 1976.[6] In

to the sum of the payments to which he and all other persons are entitled for such month ... and the balance, if any, of such excess earnings shall be charged to each succeeding month in such year to the extent, in the case of each such month, of the sum of the payments to which such individual and all other persons are entitled for such month ... until the total of such excess has been so charged....

In 1974, 42 U.S.C. § 403(f)(3) (Supp. IV 1974) provided that

an individual's excess earnings for a taxable year shall be 50 per centum of his earnings for such year in excess of [$2400] ....

Thus, in 1974, recipients' benefits were reduced by 50 percent of their earnings over $2400—a $1 reduction for every $2 of excess earnings.

4. 45 U.S.C. § 231a(g)(2) (1976) provides that deductions from survivors' benefits under the Railroad Retirement Act

shall be made from any payments to which a survivor is entitled ... for any month, if for such month such survivor is ... charged with excess earnings under section 203(f) of the Social Security Act [42 U.S.C. § 403(f)] ....

The Railroad Retirement Act did not provide for the payment of annuities to survivors of railroad workers until 1946. Until that time the Act provided for payment of a lump sum death benefit to such survivors. Railroad Retirement Act of 1937, Pub.L. No. 75–162, § 5, 50 Stat. 307, 312. Consequently, there was no excess earnings provision applicable to survivors at that time.

In 1946, the Railroad Retirement Act was amended to include survivors' annuities analogous to those provided under the Social Security Act. Act of July 31, 1946, Pub.L. No. 79–572, § 213, 60 Stat. 722, 729 (codified as amended as 45 U.S.C. § 228e (1970 & Supp. IV 1974)). At that time an excess earnings provision was added to the Act. It provided for a $1 reduction in benefits for each $1 of earnings over $25 per month. *Id.* at 731. The exempt amount was raised to $50 per month in 1951, Act of Oct. 30, 1951, Pub.L. No. 82–234, § 20, 65 Stat. 683, 687; and to $75 per month in 1952, in conjunction with an identical change in the excess earnings provision of the Social Security Act. Social Security Act Amendments of 1952, Pub.L. No. 82–590, § 6(d)(2), 66 Stat. 767, 777. Finally, in 1954, the excess earnings provision of the Railroad Retirement Act was amended to incorporate the excess earnings provision of the Social Security Act by reference. Social Security Amendments of 1954, Pub.L. No. 83–761, § 401(d), 68 Stat. 1052, 1098.

Although there is no legislative history which explains the incorporation by reference amendment, a likely motive is readily apparent. Prior to 1954, the excess earnings provision of the Railroad Retirement Act was regularly amended to reflect concurrent changes in the Social Security Act provision. *See, e.g.,* Social Security Act Amendments of 1952, Pub.L. No. 82–590, § 6(d)(2), 66 Stat. 767, 777. By incorporating the Social Security Act provision by reference, Congress eliminated the need to amend the Railroad Retirement Act provision to reflect changes in the Social Security Act provision, while at the same time it ensured that the excess earnings provisions of both Acts would be identical. The placing of the incorporation by reference amendment in a section titled "Amendments Preserving Relationship Between Railroad Retirement and Old-Age and Survivors Insurance" reflects this congressional motive. Social Security Amendments of 1954, Pub.L. No. 83–761, § 401, 68 Stat. 1052, 1097.

5. *See* note 3 *supra.*

6. The erroneous deduction of the extra $44 from petitioner's Social Security benefits was apparently due to an error by the Administra-

1978, the Board notified petitioner that the Administration had informed it of her 1974 excess earnings and that, as a result of those earnings, she had been overpaid $700 in Railroad Retirement Act benefits in 1974. Accordingly, the Board deducted that amount from her benefits in 1978. Administrative Record at 31–34.

Petitioner administratively challenged the Board's deduction of the $700 from her benefits. The Board's Bureau of Retirement Claims rejected her appeal, and its decision was sustained by a Board appeals referee. The Board upheld the referee's findings, holding that the Railroad Retirement "Act contains no exception to the earnings limitation for those individuals who are also receiving a social security benefit subject to the same limitation." In re *Alberta E. Burns,* Railroad Retirement Act Claims Appeal Docket No. 1883, 2 (U.S.R.R. Retirement Bd. Dec. 11, 1980), Administrative Record at 2, 3. Petitioner subsequently filed her petition for review with this Court.[7]

## II.

### A. *Propriety of Looking to Legislative History for Guidance*

It is clear that 42 U.S.C. § 403 (1976 & Supp. IV 1980)[8] and 45 U.S.C. § 231a(g) (1976)[9] authorize the Board and the Administration to deduct $1 from an individual's benefits for every $2 of excess earnings.

However, neither the Railroad Retirement Act nor the Social Security Act specifies how deductions for excess earnings are to be made from individuals receiving benefits under both programs. Petitioner argues that the Board's policy of deducting 50 percent of excess earnings from a recipient's benefits irrespective of whether the Administration has also deducted 50 percent of those excess earnings "is a narrow, overly-literal interpretation which contradicts the Congressional intent . . . ." Brief for Petitioner at 19. Respondent counters that where, as here, "the statutory language is clear and unequivocal, there is no need to analyze legislative history to determine legislative intent." Brief for Respondent at 19. Thus, at the outset, it is necessary to determine the propriety of looking to legislative history for guidance as to the proper interpretation of the excess earnings provisions.

The function of this Court in interpreting an act of Congress "is to construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) (footnote omitted). Often the language of a statute may so clearly reveal the purpose for its enactment that resort to aids of construction such as legislative history is unnecessary to properly interpret the statute.[10] Yet it is axiomatic that a court should not interpret a statute according to its literal

tion—it recorded petitioner's 1974 earnings as $3888. *See* Administrative Record at 35–36.

**7.** Jurisdiction to review the Board's action is granted to this Court by 45 U.S.C. §§ 231g, 355(f) (1976).

Petitioner has also intervened in an action pending before the United States District Court for the Western District of Missouri. *Linquist v. Schweiker,* No. 80–0698–CV–W (W.D.Mo. filed July 31, 1980). Plaintiff in that action was receiving benefits in 1977 under the Railroad Retirement Act and the Social Security Act. The Board determined that she had excess earnings for that year and deducted 50 percent of those earnings from her benefits. Subsequently, the Administration recovered an additional 50 percent of those earnings. Plaintiff challenged the 100 percent recovery policy in a class action now pending before the district court.

Noting that the district court had not yet ruled on the Board's motion to dismiss on the grounds that the district court lacked jurisdiction to review the Board's action, petitioner filed a petition for review with this Court. This petition includes an additional claim—that the Board erred in refusing to waive recovery of petitioner's excess earnings—not present in *Linquist.* The district court has stayed its proceedings pending disposition of petitioner's action in this Court. *Linquist v. Schweiker,* No. 80–0698–CV–W (W.D.Mo. Dec. 30, 1982).

**8.** *See* note 3 *supra.*

**9.** *See* note 4 *supra.*

**10.** *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language

meaning if to do so would produce absurd or unreasonable results contrary to its purpose.[11] As Justice Reed stated in *American Trucking:*

> When that meaning has led to absurd or futile results ... this Court has looked beyond the words to the purpose of the act.... [E]ven when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. *When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear*

the words may appear on "superficial examination." The interpretation of the meaning of statutes as applied to justiciable controversies, is exclusively a judicial function.

*Id.* at 543–44, 60 S.Ct. at 1063–64 (emphasis added) (footnotes omitted) (quoting *Ozawa v. United States,* 260 U.S. 178, 194, 43 S.Ct. 65, 67, 67 L.Ed. 199 (1922)). In sum, statutes should be given a "sensible construction" in light of their language *and* their purpose for enactment. *See United States v. Kirby,* 74 U.S. (7 Wall.) 482, 486–87, 19 L.Ed. 278 (1869).[12]

Furthermore, courts should be wary of adopting a literal interpretation of a statute

of the statute itself. Absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive"); *United States v. American Trucking Ass'ns, supra,* 310 U.S. at 543, 60 S.Ct. at 1063 ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation").

11. Judge Learned Hand stated the proposition as follows:
> [I]t is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning. Indeed, in extreme situations this doctrine has been carried so far that language inescapably covering the occasion has been disregarded when it defeats the manifest purpose of the statute as a whole.

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960). *See also Cawley v. United States,* 272 F.2d 443, 445 (2d Cir.1959) (L. Hand, J.); *Federal Deposit Ins. Corp. v. Tremaine,* 133 F.2d 827, 830 (2d Cir. 1943) (L. Hand, J.) ("There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it"). Examples of courts applying this proposition to the interpretation of statutes are legion. *See, e.g., Cass v. United States,* 417 U.S. 72, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974); *Perry v. Commerce Loan Co.,* 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966); *United States v. Witkovich,* 353 U.S. 194, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957); *United States v. American Trucking Ass'ns, supra; Church of the Holy Trinity v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); *United States v. Kir-*

by, 74 U.S. (7 Wall.) 482, 19 L.Ed. 278 (1869); *In re Adamo,* 619 F.2d 216 (2d Cir.), *cert. denied,* 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980); *Natural Resources Defense Council, Inc. v. Tennessee Valley Auth.,* 459 F.2d 255 (2d Cir.1972); *Lawless v. Davis,* 98 Idaho 175, 560 P.2d 497 (1977); *Pacific Power & Light Co. v. State Tax Comm'n,* 249 Or. 103, 437 P.2d 473 (1968). And, as the Supreme Court has noted, the proposition is not new to the law:
> The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "that whoever drew blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—"for he is not to be hanged because he would not stay to be burnt."

*United States v. Kirby,* 74 U.S. (7 Wall.) 482, 487, 19 L.Ed. 278 (1869).

12. In the words of Justice Frankfurter,
> once the tyranny of literalness is rejected, all relevant considerations for giving a rational content to the words become operative. A restrictive meaning for what appear to be plain words may be indicated by the Act as a whole, by the persuasive gloss of legislative history or by the rule of constitutional adjudication ... that such a restrictive meaning must be given if a broader meaning would generate constitutional doubts.

*United States v. Witkovich,* 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765 (1957). So, too, this Court has cautioned that a
> statute is not to be read overliterally. It has long been settled that acts of Congress must

without considering extrinsic aids to construction such as legislative history. Often such an interpretation, which may appear reasonable in isolation, is shown to be unreasonable in light of the purpose of the statute revealed by the legislative history.[13] Where the language of a statute does not foreclose all doubt as to its proper construction, it is simply prudent for a court to consider extrinsic evidence of the statute's purpose in determining its proper construction.[14]

I consider it to be appropriate in this case to look to the relevant legislative history

for guidance in determining the proper interpretation of the excess earnings provisions of the Railroad Retirement Act and the Social Security Act. Those provisions clearly apply to individuals receiving benefits under only one Act, but *neither Act expressly deals with individuals receiving benefits under both Acts.* While it is arguably correct to assert that the excess earnings provisions indicate a $1 deduction for every $1 of excess earnings under the circumstances presented by this case, there is sufficient doubt whether Congress intended such result that resort to the legislative history of the excess earnings provisions to

be interpreted in light of the spirit in which they were written and the reasons for their enactment.
*General Serv. Employee Union Local 73 v. NLRB,* 188 U.S.App.D.C. 119, 124, 578 F.2d 361, 366 (1978) (footnotes omitted).

13. For example, in *Perry v. Commerce Loan Co.,* 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966), the respondent urged a literal interpretation of the Bankruptcy Act which would have prevented confirmation of wage-earner extension plans if the wage-earner had received any discharge in bankruptcy within the previous six years. The Court rejected the literal interpretation, holding that "[t]o apply the six-year bar at the time of ruling on the confirmation of an extension plan would be both illogical and in head-on collision with the congressional purpose ...." *Id.* at 399, 86 S.Ct. at 856. In *Church of the Holy Trinity v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), the United States urged a literal reading of an immigration statute which would have rendered unlawful the church's payment of an English minister's expenses in traveling to New York to serve as the church's rector and pastor. The Court construed the statute to include only manual laborers, in accordance with what it found to be the purpose of the statute. *Id.* at 463–65, 12 S.Ct. at 513–14. The Court concluded that "however broad the language of the statute may be, the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute." *Id.* at 472, 12 S.Ct. at 516.

*See also United States v. American Trucking Ass'ns, supra,* 310 U.S. at 542, 60 S.Ct. at 1063 ("The Motor Carrier Act lays little emphasis upon the clause we are called upon now to construe .... [It is] a part of an elaborate enactment drawn and passed in an attempt to adjust a new and growing transportation service to the needs of the public. To find [its] content, [it] must be viewed in [its] setting"); *Natural Resources Defense Council, Inc. v. Tennessee Valley Auth.,* 459 F.2d 255, 257 (2d

Cir.1972) ("In holding that [the statute] permits a result apparently so eccentric, the court fell into error by treating [it] simply as a text to be parsed with such aid as the dictionary and grammar afford and without adequately considering the history of the statute and the evil it was designed to cure"); *Pacific Power & Light Co. v. State Tax Comm'n,* 249 Or. 103, 110, 437 P.2d 473, 476 (1968) ("[T]he particular language relied on by plaintiff ... is, standing alone, free from ambiguity.... Ambiguity emerges when, having in mind the reason for enactment of the statute and the purpose to be accomplished by it, the words are read in context and in light of legislative policy.

14. *See Cass v. United States,* 417 U.S. 72, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974). There the Court construed a statute providing for a "readjustment payment" to members of the Armed Forces reserve who were involuntarily released from duty after completion of at least five years of active duty. The statute included a "rounding provision" which provided that any part of a year greater than six months was to be counted as a whole year. *Id.* at 73–74, 94 S.Ct. at 2168. Petitioners in *Cass* argued that the rounding provision, read literally, applied to the five-year eligibility requirement and, therefore, "resort to legislative history is unnecessary and improper." *Id.* at 76, 94 S.Ct. at 2169 (footnote omitted). The Court disagreed:

The rounding provision is arguably subject to the interpretation given it by petitioners, but did Congress intend that provision to override its explicit requirement of "at least" five years of service? *We think the answer to that question is sufficiently doubtful to warrant our resort to extrinsic aids to determine the intent of Congress, which, of course, is the controlling consideration in resolving the issue before us.*

*Id.* at 77, 94 S.Ct. at 2170 (emphasis added) (footnote omitted). *Accord Perry v. Commerce Loan Co.,* 383 U.S. 392, 401, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966).

determine the congressional intent is warranted.[15] Examination of that legislative history reveals that the Board's interpretation of the excess earnings provisions is not in keeping with the "spirit in which they were written and the reasons for their enactment." *General Service Employee Union Local 73 v. NLRB,* 188 U.S.App.D.C. 119, 124, 578 F.2d 361, 366 (1978).

## B. *Legislative History of the Excess Earnings Provisions*

Prior to 1972, the excess earnings provisions of the Social Security Act and, therefore by reference, the Railroad Retirement Act, imposed a $1 deduction from benefits for every $1 in excess earnings. In 1972, in response to a proposal from the Nixon administration,[16] Congress adopted amendments to the Social Security Act[17] which, *inter alia,* replaced the excess earnings formula with the present $1 deduction from benefits for every $2 in excess earnings. *See* H.R.Rep. No. 231, 92d Cong., 1st Sess. 49 (1971); S.Rep. No. 1230, 92d Cong., 2d Sess. 28 (1972), U.S.Code Cong. & Admin. News 1972, p. 4989.

The clearly articulated purpose of this change was to encourage retired persons to work by increasing the benefits of doing so. Thus, the House Report accompanying the 1972 Amendments stated:

> [Y]our committee believes that the American people do not want a system which

results in promoting welfare as a way of life. Your committee's deliberations, therefore, have been aimed toward providing adequate assistance to those who cannot help themselves, while at the same time *creating a system of assistance which will maximize the incentive and the obligation of those who are able to work to help themselves.*

H.R.Rep. No. 231, *supra,* at 2 (emphasis added), U.S.Code Cong. & Admin.News 1972, p. 4990. The House Report emphasized the intent of Congress to encourage work when it discussed the rationale for changing the excess earnings provision:

> This change would assure that the more a beneficiary works and earns, the more spendable income (that is, social security benefits plus earnings after taxes) he will have.

*Id.* at 49, U.S.Code Cong. & Admin.News 1972, p. 5036. The Senate Report reiterated this theme:

> The committee agrees with the President that *work should be rewarded and its value to the worker increased....* A number of ... provisions [including the excess earnings provision] are included in the committee bill which reflects the committee's aim of *increasing the benefits of working.*

S.Rep. No. 1230, *supra,* at 4 (emphasis added). Significantly, the Senate Report concluded that "there would be no $1-for-$1

---

**15.** I find the position urged by the Board—that the clear literal interpretation of the excess earnings provisions eliminates the need to resort to the legislative history of those provisions—to be identical to that rejected by the Court in *Cass. See* note 14 *supra.*

**16.** In his message to Congress accompanying the administration's proposed amendments to the Social Security Act, President Nixon explained the need to amend the excess earnings provisions:

> A feature of the present social security law that has drawn much criticism is the so-called "retirement test," a provision which limits the amount that a beneficiary can earn and still receive full benefits.... *The present retirement test actually penalizes social security beneficiaries for doing additional work or taking a job at higher pay. This is wrong.*

> In my view, many older people should be encouraged to work. Not only are they provided with added income, but the country retains the benefit of their skill and wisdom; they, in turn, have the feeling of usefulness and participation which employment can provide.

President's Message to Congress Transmitting Proposals for Welfare Reform and Social Security Amendments (Sept. 25, 1969), in House Comm. on Ways and Means, 91st Cong., 1st Sess., The President's Proposals for Welfare Reform and Social Security Amendments 1969, 12 (Comm. Print 1969).

**17.** The 1972 Amendments to the Social Security Act were described as "the most massive revision of the social security laws that the Congress has ever undertaken." S.Rep. No. 1230, 92d Cong., 2d Sess. 3 (1972).

reduction [in benefits] as under present law." *Id.* at 28.[18]

Although the explicit purpose of Congress in altering the excess earnings provision was to encourage retired persons to work, and to provide them greater rewards if they did, Congress clearly recognized that working retirees would also help relieve the financial burdens on the benefit programs. Under the prior $1-for-$1 excess earnings formula, a rational person would not work because there was no incentive to do so—each dollar earned would cost a dollar of benefits, and earnings were taxed while benefits were not. To the extent that retired persons did not work, their benefit payments could not be reduced by recovering excess earnings. Congress clearly thought that more retired persons would work under the new $1-for-$2 excess earnings formula because they would be assured of realizing some net income from work earnings if their benefits were reduced because of such earnings. To the extent that retired persons do work, their benefit pay-

ments can be reduced by recovering excess earnings, thus relieving some of the financial burden on the benefit programs.

The Board offers no legislative history which contradicts the conclusion that the purpose of the 1972 amendments to the excess earnings provision was to encourage retired persons to work.[19] It merely argues that in "incorporating [the excess earnings] provisions into the Railroad Retirement Act [in 1954], Congress could not have been unaware that it was subjecting widows ... who received a social security benefit in addition to their railroad retirement annuity to a double offset." Brief for Respondent at 21. I cannot agree. There is no evidence in the legislative history of the Social Security Amendments of 1954 that Congress intended to impose a double deduction on individuals receiving benefits under both Acts when it included an amendment to the Railroad Retirement Act incorporating the excess earnings provision of the Social Security Act by reference.[20] There is no specific legislative history with

18. Testimony at congressional hearings on the 1972 Amendments supports the conclusion that the change in the excess earnings provision was designed to encourage retired persons to work. *See, e.g., Social Security and Welfare Proposals: Hearings Before the House Comm. on Ways and Means,* 91st Cong., 1st Sess. 155 (1969) (statement of John G. Veneman, Under Secretary of Health, Education, and Welfare) (emphasis added) ("[T]he really basic structural reform that we are proposing is that the dollar-for-dollar adjustment be dropped and that there be *no point where more than a dollar in benefits is taken away for each $2 that an individual earns, so that the present situation, where an individual ... will find that he is actually losing by earning more, will no longer exist.* Under present law a person loses because he has expenses of working and he has to pay income taxes.... So he can lose by taking a job ...").

19. The Board notes that a bill amending the Railroad Retirement Act to reflect petitioner's interpretation of the excess earnings provisions failed to pass the House in 1976. *See* H.R. 14153, 94th Cong., 2d Sess. (1976). However, the bill was never considered by the committee to which it was referred and its failure to pass simply cannot be read to reflect congressional acquiescence in the Board's interpretation of the excess earnings provisions. *Cf. State Farm Mut. Auto. Ins. Co. v. Department of Transp.,* 220 U.S.App.D.C. 170, 192–93, 680 F.2d 206,

228–29, *cert. granted,* —— U.S. ——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982) (Repeated failure of Congress to reverse agency position represents congressional ratification of that position). I also attach little significance to the passing reference to the possibility of double deductions in the 570-page Report to Congress by the Commission on Railroad Retirement cited by the majority. H.R. Doc. No. 350, 92d Cong., 2d Sess. (1972); at 198. "May not judicial notice be taken of the fact that ... in the rush and flurry of events active congressmen may never have an opportunity to read these reports at all?" *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 216 U.S.App.D.C. 232, 269, 670 F.2d 1051, 1088 (1981) (Mikva, J., concurring).

20. The Board's argument is even less acceptable if it is remembered that the excess earnings provisions in 1954 provided for a $1 deduction for each $1 in excess earnings. Thus, if the deduction was applied twice to recipients of benefits under both programs, they actually would be penalized for working because they would lose $2 in benefits for each $1 in excess earnings. There is absolutely no indication in the legislative history that Congress intended this absurd result.

At oral argument, counsel for the Board asserted that prior to 1972 the Board and the Administration *did* enforce double deductions, with the result that persons receiving benefits under both programs lost $2 in benefits for

respect to the incorporation by reference amendment,[21] but once again in the overall legislation Congress evidenced a desire to encourage retirees to work and to increase the benefit to them of doing so.[22]

More importantly, in 1954, when Congress incorporated by reference the excess earnings provision of the Social Security Act into the Railroad Retirement Act, individuals such as petitioner received only the greater of the benefits under the Railroad Retirement Act or the Social Security Act to which they were entitled.[23] It was not until 1955 that Congress amended the Railroad Retirement Act to permit such individuals to receive both benefits. Act of Aug. 12, 1955, Pub.L. No. 84–383, § 2, 69 Stat. 715, 716. Thus, contrary to the Board's assertion, Congress in 1954 was necessarily unaware that it might be imposing double excess earnings offsets on individuals such

each $1 in excess earnings. *See* at 194–195 n. 4. However, nothing in the record, or in the Board's response to our supplementary inquiry on this subject, *Burns v. United States R.R. Retirement Bd.*, No. 81–2293 (D.C.Cir. Dec. 13, 1982), demonstrates that the Board and the Administration ever recovered $2 in benefits for $1 in excess earnings from any beneficiary. I doubt that either agency had many opportunities to do so. Congress found that the prospect of losing $1 in benefits for every $1 of excess earnings discouraged retired persons from working. The likelihood of beneficiaries working would be even less if such persons would lose $2 in benefits for every $1 of excess earnings.

Even if it were the longstanding practice of the agencies to recover double deductions from those receiving benefits under both programs, that circumstance would not control here. Deference to agency practice is inappropriate if that practice frustrates the congressional purpose underlying a statute. *Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 ("In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose"); *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm'n*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (quoting *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)) ("[C]ourts ... 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute' ").

**21.** *See* note 4 *supra.*

**22.** The House Report on the 1954 Amendments concluded that

certain amendments should be made to ... afford greater opportunities to retired individuals to supplement their benefits through earnings from part-time or intermittent work. H.R.Rep. No. 1698, 83d Cong., 2d Sess. 20 (1954). Similarly, the Senate Report stated that

your committee believes older people who are retired, but who are able to undertake at least some productive employment should have more generous provisions made than in present law with respect to their receipt of benefit payments under the program.
S.Rep. No. 1987, 83d Cong., 2d Sess. 3 (1954), U.S.Code Cong. & Admin.News 1954, p. 3710, 3712. What discussion there was of the 1954 amendment to the excess earnings provision in the congressional hearings on the Social Security Amendments of 1954 focused on the possibility of liberalizing that provision to further encourage retired persons to work. Senator Russell Long presaged the thinking of Congress in adopting the 1972 amendment to the excess earnings provision when he suggested that

it might be well to maybe deduct $5 every time the man made another $10, so that there would be a savings to the Government and at the same time the man would be encouraged to earn something for himself.... I predict that before we get to having this 27 million people over 65 years of age it is going to occur to somebody that ... we may want to encourage them to work rather than discourage it.
*Social Security Amendments of 1954: Hearings on H.R. 9366 Before the Senate Comm. on Finance,* 83d Cong., 2d Sess. 160–61 (1954) (remarks of Senator Russell Long).

**23.** The Railroad Retirement Act of 1937, § 5(g)(2), 45 U.S.C. § 228e(g)(2) (Supp. II 1952), *repealed by* Act of Aug. 12, 1955, Pub.L. No. 84–383, § 2, 69 Stat. 715, 716, provided, in pertinent part:

If an individual is entitled to [a survivors'] annuity for a month under this section and is entitled ... for such month to an insurance benefit under section 402 of Title 42 [Social Security Act], the annuity of such individual for such month under this section shall be only in the amount by which it exceeds such insurance benefit.
Thus, to the extent that individuals' Social Security benefits exceeded their Railroad Retirement benefits they received only the greater Social Security benefits; if their Railroad Retirement benefits were greater, they received their Social Security benefits and a Railroad Retirement benefit equal to the difference between the two benefits—in total equal to the greater Railroad Retirement benefits.

as petitioner since at that time they could *not* receive dual benefits.[24]

In my view it is apparent that Congress never considered the situation of individuals receiving benefits under both Acts when it amended the Railroad Retirement Act in 1954 to incorporate the excess earnings provision of the Social Security Act by reference, or when it amended that provision in 1972 to adopt the $1-for-$2 excess earnings formula. When considering substantial re-

visions to statutes as complex as the Social Security Act, Congress necessarily focuses on major policy questions, not on peripheral issues.[25] It is a well established role of the courts to construe statutes to deal with circumstances never contemplated by the legislature.[26] The task of construing the excess earnings provisions with respect to the unanticipated situation presented by this case should be guided by the legislative history previously discussed.

**24.** *See* note 2 *supra.* This fact also undermines the majority's conclusion that "Congress might well have considered a double offset a fitting match for a double benefit. The second offset for the dual beneficiary ameliorates the disparity in benefits received by similarly situated surviving spouses ... most of whom qualify for only one benefit." At 198. In 1954, when Congress first incorporated the excess earnings provision of the Social Security Act into the Railroad Retirement Act, individuals entitled to benefits under both programs received no more benefits than their counterparts entitled to benefits under only one of the programs. *See* note 23 *supra.* Yet the interpretation of the excess earnings provisions followed by the Board and the Administration, and accepted by the majority, would have imposed double excess earnings offsets on individuals entitled to benefits under both programs without regard to amounts received simply because a portion of their benefits came from the Board and the balance came from the Administration. In my view, such a result is entirely unreasonable, unexplainable even by the congressional purpose suggested by the majority. Furthermore, there is no evidence that Congress intended to amend the excess earnings provisions when it amended the Railroad Retirement Act in 1955 to permit dual beneficiaries, such as petitioner, to receive full benefits under both programs. *See* S.Rep. No. 1040, 84th Cong., 1st Sess. 3, 8–9 (1955).

**25.** *See* note 17 *supra.*

**26.** *Cass v. United States,* 417 U.S. 72, 83, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668 (1974); *Church of the Holy Trinity v. United States,* 143 U.S. 457, 472, 12 S.Ct. 511, 516, 36 L.Ed. 226 (1892); *Freeman v. Harris,* 625 F.2d 1303, 1307 (5th Cir.1980); *In re Adamo,* 619 F.2d 216, 219–21 (2d Cir.), *cert. denied,* 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980); *Lawless v. Davis,* 98 Idaho 175, 177, 560 P.2d 497, 499 (1977).

Although conceding that Congress did not "specifically" consider "the dual beneficiary's situation" when it legislated with respect to the excess earnings provisions, at 196, 197, the majority declines to "venture to guess how

Congress would have responded had it been asked the question this case poses" and to "offer ... speculation as to what solution the legislature would have adopted had it specifically adverted to this case ...." at 197–198. The majority's reluctance stems from the purported "ambivalence of Congress regarding allowance of dual benefits" and from the fact that "Congress *might well* have considered a double offset a fitting match for a double benefit." at 197, 198 (emphasis added).

Yet by upholding the interpretation of the excess earnings provisions advanced by the Board, the majority necessarily "speculates" that Congress would have imposed double offsets on dual beneficiaries had it considered the question. The majority engages in further "speculation" when it suggests a purpose for congressional imposition of double deductions on persons receiving benefits under both programs—"[t]he second offset for the dual beneficiary ameliorates the disparity in benefits received by similarly situated spouses ... most of whom qualify for only one benefit." at 198. There is simply no evidence of such a congressional purpose in the legislative history of the excess earnings provisions. *See* at 198–199.

Nor do I view the *prospective* elimination of dual benefits under the Railroad Retirement and Social Security Acts as reflecting congressional ambivalence toward allowance of multiple benefits to existing dual beneficiaries such as petitioner. At 197. *See* note 2 *supra.* In eliminating dual benefits, Congress carefully preserved the rights of those individuals already receiving benefits under both Acts, noting that

any plan to eliminate these dual benefits should include protection of the equities of existing beneficiaries and employees with claims upon such benefits. Dual beneficiaries cannot fairly be criticized, since they have merely secured the benefits to which they are entitled under existing law. That is why their equities should be preserved.

H.R.Rep. No. 1345, 93d Cong., 2d Sess. 11 (1974). Dual benefits also reflect the additional work required for entitlement.

## C. Interpretation of the Excess Earnings Provisions

The Board urges this Court to construe the excess earnings provisions to allow it to reduce recipients' benefits for excess earnings even though the Social Security Administration also reduces their benefits for excess earnings. Against the background of congressional solicitude for working retirees revealed in the legislative history of the excess earnings provisions, I find the Board's position untenable. The Board's literal interpretation results in a $1 deduction from benefits for every $1 of excess earnings, *the very excess earnings formula which Congress rejected in 1972* as contrary to its goal of encouraging retired persons to work and increasing the benefit to them of doing so. I simply cannot ignore the overwhelming and uncontradicted evidence of congressional purpose found in the legislative history of the 1972 amendments.[27] The excess earnings provisions of the Railroad Retirement and Social Security Acts, sharing as they do a common legislative history and purpose, must be read *in pari materia* to effectuate the congressional purpose to *encourage* retired persons to work.[28] Re-ducing benefits by 100 percent of their excess earnings flies in the face of that purpose.

The explicit purpose of Congress in amending the excess earnings provisions was to encourage retirees to work. The 1972 amendment was not an isolated instance of congressional beneficence; rather, Congress had regularly demonstrated interest in liberalizing the excess earnings provisions since 1951.[29] Congress determined that a $1 reduction in benefits for every $2 in excess earnings would best effectuate its purpose to encourage retired individuals to work. Under these circumstances, I think it reasonable to require the Board and the Administration to coordinate their reduction of benefits for excess earnings so that recipients lose no more than $1 of benefits for every $2 in excess earnings, even if they receive benefits under both Acts.[30] This construction of the excess earnings provisions will further the congressional purpose by insuring that individuals receiving benefits under both Acts are encouraged to work.

This conclusion is supported by a recent decision of the Fifth Circuit addressing a

**27.** Unlike the majority, I find the legislative history of the excess earnings provisions to be substantial "evidence that Congress envisioned but one offset for the retiree who receives two ... benefits." at 196.

**28.** *United States v. Freeman,* 44 U.S. (3 How.) 556, 564, 11 L.Ed. 724 (1845) ("The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts *in pari materia* are to be taken together, as if they were one law"); *Thielebeule v. M/S Nordsee Pilot,* 452 F.2d 1230, 1232 (2d Cir. 1971) ("The two provisions involved herein deal with the matters relating to the same subject matter ... and should therefore be construed *in pari materia....* These 'closely related provisions' ... must be construed together, and should be construed if possible so as to effectuate the legislative policies of both").

**29.** *See, e.g.,* Act of Oct. 30, 1951, Pub.L. No. 82–234, § 20, 65 Stat. 683, 687; Social Security Act Amendments of 1952, Pub.L. No. 82–590, § 6(d)(2), 66 Stat. 767, 777; Social Security Amendments of 1954, Pub.L. No. 83–761, § 103, 68 Stat. 1052, 1073; Social Security Amendments of 1965, Pub.L. No. 89–97, § 310,

79 Stat. 286, 380; Social Security Amendments of 1967, Pub.L. No. 90–248, § 107, 81 Stat. 821, 834 (1968).

**30.** The Board and the Administration should be able to coordinate their reduction of benefits for excess earnings without difficulty. The foundation for such coordination is apparently already in place since the Administration informed the Board of the petitioner's 1974 excess earnings after she reported those earnings to the Administration. Administrative Record at 31–32.

The majority faults this opinion for leaving the details of coordinating the reduction of benefits for excess earnings to the Board and the Administration. At 199 n. 13. However, it is appropriate to rely on those agencies, to whom Congress has delegated the responsibility to administer the Railroad Retirement and Social Security Acts, to coordinate the deductions for excess earnings of dual beneficiaries. This could be accomplished by simply informing the agencies that their interpretation of the excess earnings provisions of the Acts is incorrect and remanding to the agencies to develop policies consistent with the proper interpretation of those Acts.

similar statutory construction problem. *Freeman v. Harris,* 625 F.2d 1303 (5th Cir. 1980). There, plaintiff was entitled to benefits under the Social Security Act, the Black Lung Act, and his state's workers' compensation statute. *Both* federal programs authorized the Secretary of Health, Education, and Welfare to reduce benefits if a recipient received state workers' compensation benefits. The Secretary's policy was to fully deduct the state payments from a recipient's benefits under both Acts. As a result, plaintiff received less total benefits under the three programs than he would have received had he not applied for state benefits. The Fifth Circuit found the Secretary's policy contrary to the intent of Congress and ordered the Secretary to limit total deductions to no more than 100 percent of the state payments. *Id.* at 1305, 1309.

The court interpreted the offset provision to have two purposes—to avoid over-replacement of workers' prior income and, more importantly, to ensure that state workers' compensation programs were the primary providers of benefits. The court noted that in

> this instance, however, both goals cannot be achieved. In essence, then, we are seeking to determine the intent of Congress as applied to a factual situation which obviously it did not foresee.

*Id.* at 1307. Finding that the Secretary's construction discouraged reliance on state compensation programs, the primary pur-

pose of the offset provisions, the court held that that policy was contrary to the "self-evident" intent of Congress. *Id.* at 1306, 1308–09. In my opinion the case for rejecting the Board's interpretation of the excess earnings provisions is stronger than that which led the Fifth Circuit to reject the Secretary's policy in *Freeman.* While the Secretary's policy promoted at least one goal of Congress—to avoid over-replacement of workers' prior income—the Board has not identified, nor has my investigation revealed, any purpose of Congress advanced by the Board's literal interpretation of the excess earnings provisions.[31]

### III.

In 1976, the Social Security Administration withheld $744—50 percent of petitioner's 1974 excess earnings—from her Social Security benefits. In 1978, the Railroad Retirement Board withheld an additional $700 from her Railroad Retirement benefits because of the same excess earnings. It is my conclusion that Congress intended the Board and Administration to coordinate their reductions of benefits for excess earnings so that no individual loses more than $1 in benefits for every $2 in excess earnings. Since the Administration previously reduced petitioner's Social Security benefits by 50 percent of her 1974 excess earnings, the Board erred in reducing her Railroad Retirement benefits for the same earnings. Accordingly, I would direct the Board to pay petitioner the $700 improperly withheld

---

**31.** *See also Bahre v. Hogbloom,* 162 Conn. 549, 295 A.2d 547 (1972). There the court considered the interrelationship of two provisions of the Connecticut workmen's compensation statute. One provision provided that payments for total incapacity would continue throughout the period of disability, while a second limited combined payments for total incapacity, partial incapacity, and loss of limb to 780 weeks. Plaintiff in *Bahre* was receiving payments for total incapacity, but had earlier received payments for partial incapacity. Defendant argued that the second provision limited plaintiff to 780 weeks of payments. *Id.* at 51, 295 A.2d at 549–50.

The court rejected this construction of the statute. *Id.* at 52–53, 295 A.2d at 551–53. The court stated:

> The history of the statute . . . demonstrates a clear intention by the legislature to upgrade and liberalize workmen's compensation payments through the years and to extend systematically the duration of payments, finally resulting in a complete removal of the ceiling on total incapacity . . . . A change of legislative intent was clearly indicated by the change of language in the amendment and it would be presumed that the legislature did not intend to produce an absurd consequence and limit the effect of that amendment through the application of another statute.

*Id.* at 51, 295 A.2d at 550. If the references to the compensation statute at issue in *Bahre* were appropriately changed, the court's statement would be equally applicable to the excess earnings provisions of the Railroad Retirement and Social Security Acts.

from her 1978 benefits. Because the majority concludes that dual beneficiaries are subject to a $1 reduction in benefits for each $1 in excess earnings, I respectfully dissent.